Laramore, Judge,
delivered the opinion of the court:
This is an action for the alleged taking by the government of certain personal property owned by plaintiff. In the al *791 ternative, plaintiff claims restitution plus rent. Plaintiff alleges defendant took its personal property at Fort Ord, California, simultaneously with the condemnation of the property interests of two “Wherry” housing corporations,[1] namely, the Likins-Foster Ord and Likins-Foster Monterey Corporations.
In 1950, two Wherry housing projects of 500 units each were built for Fort Ord personnel at Monterey, California. The first project, known as Bay View Park, was owned by Likins-Foster Ord Corporation (hereinafter L-F Ord). The second project, known as North Bay View Park, was owned by Likins-Foster Monterey Corporation (hereinafter L-F Monterey). Both corporations were wholly-owned by the partnership, Likins-Foster & Associates, and later, by its successor, Likins-Foster Honolulu Corporation. T. Jack Foster was president of the above corporations.
Prior to the commencement of the L-F Ord and L-F Monterey projects, two other Foster-controlled corporations had started construction on Wherry housing at the Biggs Air Force Base in El Paso, Texas. As a result of discussions between Foster’s partner and the Commanding General at Biggs regarding methods of increasing the occupancy rate of the housing units, a corporation was set up to purchase furniture for rental to service personnel whose own furniture had been delayed in shipment. It was necessary to use a separate leasing corporation because charter limitations of the Wherry Act forbid Wherry corporations from renting household funiture and television antennas.
The occupancy problem was the same at Ford Ord. Military personnel reporting for duty from foreign assignments frequently did not have the necessary furnishings for an unfurnished apartment. This caused great inconvenience because even though apartments were available, they were *792 not usable for lack of furniture. After discussions concerning this problem between Foster, the Commanding General, and others at Fort Ord who had heard of the furniture rental operation at Biggs, a third corporation, the plaintiff, was incorporated. Plaintiff thereafter purchased apartment furnishings to rent to military personnel. The two Wherry corporations and plaintiff utilized the same office and the same employees and plaintiff stored its personal property in the warehouses owned by the Wherry corporations. The military tenants, if they chose to rent either household furniture or a television antenna, or both, entered into a rental agreement with plaintiff, separate from the rental of apartments from either of the Wherry corporations.
In January of 1957, it was determined that “Capehart” housing[2] would be constructed at Fort Ord, thus making it necessary for the government to buy or condemn the equities of L-F Ord and L-F Monterey. The United States Army Chief of Engineers as designee of the Secretary of Defense had the responsibility for acquiring the Wherry housing at Ford Ord. Under the special regulations issued by the Office of the Chief of Engineers, the Real Estate Division of the San Francisco District, Corps of Engineers, was given the responsibility of carrying out the acquisition. On January 18, 1957, the San Francisco District Engineer’s Office, by identical letters, advised L-F Ord and L-F Monterey that acquisition of their housing projects, situated within the Fort Ord Military Reservation, was mandatory. Inquiry was made’ in the letters as to whether L-F Ord and L-F Monterey would agree to negotiate. The two corporations, through their vice-president and attorney, Roy 0. Lytle, agreed to negotiate.
On August 29,1957, the San Francisco District Engineer’s Office received a teletype from the Office of the Chief of Engineers, authorizing negotiations to acquire the two "Wherry housing projects at Ford Ord. The teletype was *793 received in advance of the Real Estate Directive (approved August 26, 1957), which was not received in the San Francisco District Engineer’s Office until October 29, 1957. The Real Estate Directive, designated RE-D 6950, set forth the interest to be acquired from L-F Ord and L-F Monterey as—
Termination of sponsors’ leasehold interest by purchase of sponsors’ equities subject to outstanding mortgages.
Negotiations were commenced by telephone and by letter between Lytle for the two Wherry corporations and defendant’s agents. Throughout negotiations for the acquisition of the housing interests of L-F Ord and L-F Mon-terey, there was no reference to, nor any negotiation with, the plaintiff. Plaintiff was neither a Wherry nor a sponsor corporation. The Chief of the Real Estate Division, San Francisco District Engineer’s Office, was not informed by the plaintiff of its existence or that it had property at Fort Ord until the court hearing on November 7, 1957. However, the Army authorities at Ford Ord were, at all times, familiar with the existence of the plaintiff and its property.
When negotiations for acquisition of the equities of L-F Ord and L-F Monterey failed, the Army was required by law to condemn the interests of the two Wherry corporations. The Chief of Real Estate in the San Francisco District Office, Army Engineers, had prepared the requisite pleadings. One complaint in condemnation and two declarations of taking were filed, all on November 1,1957, with Declaration of Taking No. 1 describing the estates and interests of L-F Monterey Corporation, and Declaration of Taking No. 2 describing the estates and interests of L-F Ord Corporation. Included within the taking were 1,000 housing apartments, two warehouses, and items which were covered by chattel mortgages, namely, stoves, water heaters, refrigerators, and window shades, most of which were installed in the houses, but some were stored in the warehouses. The two Wherry corporations also owned numerous items of personal property not covered by the chattel mortgages, but used in connection with the operation and maintenance of the 1,000 housing units. On November 1, 1957, the Order for Deliv *794 ery of Possession, was issued and served on the two Wherry corporations. A dispute immediately arose as to whether the personal property owned by the two Wherry corporations, consisting of maintenance equipment, spare parts, and office furniture, but which was not covered by the chattel mortgages, was included within the term “apparatus and equipment” as used in the condemnation pleadings.
On November 1, 1957, plaintiff owned the following property at Fort Ord: an unworkable master television antenna system worth $37,820; 775 individual TV antennas installed in the housing units and rented on a monthly 'basis, worth $19,375; extra antennas and parts stored in the two Wherry warehouses, worth $537.66; and household furniture of all kinds, most of which was being rented to Wherry housing tenants, but some of which was stored, worth $11,576.
It is clear that there was confusion at the time as to the disposition of plaintiff’s property. However, a review of the facts shows that by December the plaintiff knew or should have known that the defendant had no intention of including plaintiff’s property in the condemnation proceedings. No documents or letters stating that the government was taking or wanted to purchase any of the plaintiff’s property were served or mailed to the plaintiff and no notice was served on the tenants concerning property leased from the plaintiff. Plaintiff was not directed to stop its rental business and no government officer or representative, orally or in writing, told any of plaintiff’s officials that it could not remove its personal property. The Army authorities did not use the master TV antenna system; it was inoperative at all times pertinent to this action. It was physically located on telephone and electric light poles, for which the plaintiff paid pole rent. Plaintiff was not named in the condemnation action, and none of its property was in any way described or referred to in the action. As a matter of fact, in a letter of December 23, 1957, the United States Army Engineer District, by registered mail, wrote to Likins-Foster & Associates in part, as follows:
* * * It is the government’s position that nothing was taken from the Biggs Rental Company.
*795 On November 8, 1957, a meeting was held in the office of an Assistant United States Attorney, which was attended by Foster, Lytle, and representatives from the Justice Department, the Corps of Engineers and Fort Ord. Since the District Court had not ruled on whether the personal property had been condemned, this meeting was called to discuss the personal property of the two Wherry, corporations and of the plaintiff. Foster and Lytle reiterated their stand that the condemnation proceedings included the personal property of all three corporations, and that they would leave it all at Fort Ord. The government representatives reiterated their opinion that the condemnation pleadings included only the items on the chattel mortgages and did not include any other personal property. Foster offered to disassemble the master television antenna system but was told that it might be used by the Army for educational television.
It was agreed at this meeting that two inventories would be prepared, one of all of the disputed maintenance personal property of L-F Ord and L-F Monterey, and the second of all of the rental personal property owned by the plaintiff. It was agreed that the values of the items would be arrived at using standard valuation methods and accepted depreciation schedules. The purpose of the inventories was that if the parties agreed as to the number and identification of the items and their value, it would eliminate such issues from the condemnation trial. Thus, the only issue for the District Court that would be left would be the legal one, i.e., was the personal property taken within the condemnation pleadings.
When the inventories were completed, on November 21, 1957, all parties were furnished duplicate copies of the joint inventories. Shortly thereafter, the three corporations ceased business at Fort Ord and left all of their personal property, as shown on the inventories, at Ford Ord, but advised defendant that they expected to be paid therefor. (Subsequent minor mathematical changes were made in the two inventories, which are immaterial to this case.) The Army then placed the personal property of the two Wherry corporations and of plaintiff in warehouses (with the exception of the inoperative master television antenna, which remained on public utility poles).
*796 The property remained in the warehouses at the trial of the condemnation case on January 13, 1960. The United States District Court entered its order that the maintenance equipment, spare parts, office furniture, and service vehicles owned by the two Wherry corporations were condemned. The sum of $49,534.58, being the amount of the inventory previously agreed upon, was paid to the two Wherry corporations. Plaintiff appeared at the trial and the District Court found that the condemnation pleadings did not describe any property or property rights of the plaintiff. Likins-Foster Monterey Corporation v. United States, 308 F. 2d 595 (9th Cir. 1962).
Under the above facts, we are called upon to determine whether in fact there was a taking of plaintiff’s property by the government for which payment is owing. In this connection, it is well settled that to constitute a taking there must be an intent on the part of the United States to take plaintiff’s property. As this court stated in B. Amusement Co. v. United States, 148 Ct. Cl. 337, 341, 180 F. Supp. 386, 389 (1960):
To constitute a taking there must be an intent on the part of the United States to take plaintiffs’ properties, or, at least, an intention to do an act the natural consequences of which was to take the property.
This is the issue in this case and the conclusion is inescapable that the defendant did not intend to nor did it take the property in question.
The facts show that the defendant did not use plaintiff’s property or prevent plaintiff from continuing its rental business ; nor did defendant prevent plaintiff from removing its personal property. There was no directive or order issued by the Army to acquire any of plaintiff’s property and no negotiations to purchase any of it.
The evidence shows that continuation of plaintiff’s rental business probably would have been unprofitable because plaintiff no longer could utilize the office space, warehouse space, or employees of the Wherry corporations as it had done before the condemnation. Under those circumstances, the evidence clearly shows that plaintiff’s representatives left all of its personal property at Fort Ord and it is there today.
*797 Plaintiff says a government agent informed it that the Army wanted the master antenna system for use in an educational program and that this evidenced a contract to purchase the same. Even if plaintiff was told this, the letter of December 23, 1957, previously quoted in part, made it clear that the government never intended to either take or purchase any of plaintiff’s property. Assuming the government employee stated the Army wanted the system, there is no evidence to indicate that he had power to enter into a contract to purchase the system. Thus we think the conduct of plaintiff through its officers indicated an intention to abandon the property.[3] At least, when informed it could have the property, the plaintiff made no effort to remove the same. In those circumstances the government was more or less in the role of an involuntary bailee. As such, the government had the duty only to reasonably protect the property while in storage. This it did. The government placed roving guards around the premises and did everything necessary to protect plaintiff’s property.
Bespecting plaintiff’s claim for the rental value of its property, the facts show that the plaintiff has failed to prove any fair market value for the rental of any or all of its property, nor has plaintiff shown that it is entitled to any rent for the property.
In summary, we hold that the evidence fails to establish a taking of plaintiff’s property for which recovery can be had, and plaintiff’s petition, therefore, must be dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a corporation organized and existing under the laws of the State of Oklahoma, is and at all times pertinent to this case was doing business in the 'State of California.
2. Commencing in about 1950, two Wherry housing pro]eets *798 (500 housing units in each) were built on the Fort Ord Military Reservation, Monterey, California. The first project, designated as Bay View Park, was owned by Likins-Foster Ord Corporation (sometimes hereinafter referred to as L-F Ord). The second project, designated as North Bay View Park, was owned by Likins-Foster Monterey Corporation (sometimes hereinafter referred to as L-F Monterey).
Both of these corporations were wholly owned subsidiaries of the partnership, Likins-Foster & Associates, and later, of its successor, Likins-Foster Honolulu Corporation (hereinafter referred to as L-F Honolulu).
Mr. T. Jack Foster was president of both of the two Wherry housing corporations at Fort Ord.
L-F Ord and L-F Monterey were also commonly known as “sponsor” corporations and/or “Wherry” corporations. These two corporations were incorporated under the Wherry Housing Act, 63 Stat. 570. The Wherry Act required that there be a separate corporation for each project.
3. Prior to the commencement of the L-F Ord and L-F Monterey projects, two other Foster-controlled corporations had started construction on Wherry housing at the Biggs Air Force Base (hereinafter referred to as Biggs AFB), El Paso, Texas. As a result of discussions between Foster’s partner and the Commanding General at the Biggs AFB, in order to increase the occupancy rate of the housing units and as a convenience to the incoming personnel, furniture was purchased for rental to service personnel whose personal furniture had been delayed in shipment.
4. L-F Ord and L-F Monterey did not own the land upon which the 1,000 housing units were constructed, both projects being situated within the Fort Ord Military Reservation. Each corporation did, however, hold a long-term lease with the Army on this land within the military reservation and for which they paid a nominal rental to the Army.
5. Although plaintiff company was originally owned by three shareholders other than the shareholders of L-F Ord and of L-F Monterey, its principal purchases were secured through or guaranteed by a partnership, Likins-Foster & *799 Associates. Mr. T. Jack Foster and his associates also controlled this partnership.
On or about January 31, 1955, Likins-Foster & Associates was bought by L-F Honolulu.
,6. Certain charter limitations, which restricted the activities of L-F Ord and L-F Monterey, prevented the corporations from engaging in the rental of household furniture and television antennas to the occupants of their housing units.
The military personnel would sometimes report for duty at Fort Ord from foreign assignments without the necessary furnishings for an unfurnished apartment. This caused much inconvenience in that although apartments were available for them, they were not able to utilize the apartments because of the lack of furniture. It also increased the vacancies of the two Wherry projects because, whereas tenants were available, tenants with furniture to utilize the apartments were not always available.
After discussions concerning the above-described problem between Foster, the Commanding General, and others at Fort Ord, who had heard of the furniture rental operation at Biggs AFB, a third corporation, the plaintiff herein, was incorporated, which company thereafter acquired a quantity of apartment furnishings which were placed in a pool from which they were rented by the plaintiff to military personnel reporting in advance of receipt of their furnishings.
i7. At all times material to this action, T. Jack Foster, president of both L-F Ord and L-F Monterey, was also president of the plaintiff, Biggs Bental Company. All three of these corporations, as wholly owned subsidiaries of L-F Honolulu, were now under a common ownership. L-F Honolulu was also controlled by Foster and his associates.
8. Plaintiff, L-F Ord, and L-F Monterey shared a common “project” office at Fort Ord, but each corporation kept a separate set of books. The employees of the three corporations, including plaintiff, performed their services for all three corporations without distinction. Employees were paid by checks drawn by L-F Ord. The management of the three corporations was substantially coextensive.
9. Furniture or television antenna rental was an optional service to be purchased by tenants of the Wherry projects *800 and neither service was a requisite for rental of an apartment unit. Furniture and television rental fees were paid at the same office at which rent for the apartments was paid, i.e., in the “project” office, referred to above, a converted rental building. Plaintiff’s excess furniture inventory was stored in a concrete warehouse owned by INF Ord and L-F Monterey. Plaintiff’s rental arrangements and rates were approved by the Army authorities at Fort Ord.
10. In early 1957 the Army approved the construction of so-called “Capehart” housing units at Fort Ord. Wherry housing differed from the Capehart housing in that the Wherry units were privately owned and were operated as “private” quarters, whereas the Capehart units were Government-owned, Government-operated, and were designated as “public” quarters. The military tenants of the Wlierry units received the statutory quarters allowance from the Army and paid their own monthly rentals, whereas the military tenants of the Capehart units were assigned free quarters and, therefore, did not receive the statutory quarters allowance.
Under the provisions of section 404 of the Housing Amendments of 1955 (69 Stat. 635, 652), as amended by section 512 of the Housing Act of 1956 (70 Stat. 1091, 1111), the Secretary of Defense, or his designee, was required to acquire all Wlierry housing located at, or near, a military reservation before Capehart housing could be occupied.
,11. In January 1957 it was determined that Capehart housing would be constructed at Fort Ord, thus making it necessary for the Government to buy or condemn the equities of L-F Ord and L-F Monterey. The Chief of Engineers, United States Army, had the responsibility for acquisition of the Wherry housing at Fort Ord. Under the special regulations issued by the Office of the Chief of Engineers, the Eeal Estate Division of the San Francisco District, Corps of Engineers, was given the responsibility for carrying out the acquisition.
On January 18, 1957, the San Francisco District Engineer’s office, by identical letters, advised L-F Ord and L-F Monterey that acquisition of their housing projects, situated within the Fort Ord Military Reservation, was mandatory. *801 Inquiry was made in the letters as to whether L-F Ord and L-F Monterey would agree to negotiate.
The two corporations, through their vice president and attorney, Boy C. Lytle, agreed to negotiate.
No mention of plaintiff or plaintiff’s property was made in any communication to, or from, either L-F Ord, L-F Monterey, or their attorney, and the Army.
.12. On August 29,1957, the San Francisco District Engineer’s office received a teletype from the Office of the Chief of Engineers, authorizing negotiations to acquire.the two Wherry housing projects at Fort Ord. The teletype was received in advance of the Beal Estate Directive (approved August 26, 1957), which directive was not received in the San Francisco District Engineer’s office until October 29, 1957. The Beal Estate Directive, designated as BE-D 6950, set forth the interest to be acquired from L-F Ord and L-F Monterey as—
Termination of sponsors’ leasehold interest by purchase of sponsors’ equities subject to outstanding mortgages.
Negotiations were commenced by telephone and by letter between Boy C. Lytle, attorney and vice president for the two Wherry corporations, and Harlan B. Watkins, Chief of the Beal Estate Division for the San Francisco District Engineer’s office, and Herman Maxwell, Chief of the Acquisition Branch, a subordinate in Mr. Watkins’ office. Throughout negotiations for the acquisition of the housing interests of L-F Ord and L-F Monterey, there was no reference to, nor any negotiation with, the plaintiff, In any event, negotiations between the parties were of short duration. Plaintiff was not a Wherry or a sponsor corporation. The Chief of the Beal Estate Division, San Francisco District Engineer’s office, was not informed by the plaintiff of its existence or that it had property at Fort Ord until the court hearing on November 7,1957. However, the Army authorities at Fort Ord were, at all times, familiar with the existence of the plaintiff and its property.
13. On November 1, 1957, plaintiff owned the following property at Fort Ord within the reservation:
(a) A master television antenna system, installed on *802 poles owned by either the “Telephone Company” or the “Electric Company,” under a license from such companies to the plaintiff. The system was installed in 1958 at the North Bay View Park project, but it never worked satisfactorily. After a year of operation, it was shut down and it never worked again. This item is valued at $37,820. Plaintiff has paid pole rental to the licensor up to the present time.
(b) Seven hundred and seventy-five individual TV antennas, installed in the housing units and rented to the tenants on a monthly basis. They were first connected in the Bay View Park project, and later, after the master TV system proved unworkable, they were comiected in the North Bay View Park project. The value of these antennas is $19,375.
(c) Extra antennas, antenna poles, ladders, tools, antenna parts, and clamps used for putting up, taking down, repairing, and replacing the antennas. All of these items were stored in the two warehouses owned by the two Wherry housing corporations. The value of these items is $537.66.
(d) Household furniture, consisting of beds, springs, mattresses, tables, chairs, chests, bureaus, mirrors, sofas, etc., being rented to tenants of the "Wherry housing units on a month-to-month basis. The items not then being rented were stored in the concrete warehouse. The value of all of the household furniture is $11,576, but there is no evidence as to the value of the items being rented as opposed to the value of the items stored in the concrete warehouse on November 1,1957, or at any later date.
None of the items of property owned by plaintiff were necessary or were required in the operation or maintenance of the 1,000 Wherry housing units as such. The television antennas and furniture were rented to the military tenants on separate forms and agreements from those used for the rental of the units, and separate rental was paid to the plaintiff. Plaintiff had no employees stationed at Fort Ord that were distinct from the employees of E-F Monterey and L-F Ord. The tenants of the "Wherry housing were not required to rent furniture or a television antenna in order to rent a Wherry house or apartment. The rental of fur *803 niture or a television antenna was a voluntary contractual arrangement between the tenant and the plaintiff.
It was, of course, necessary for those military tenants, whose reporting date at Fort Ord preceded the arrival of their furniture from overseas, to have furniture if they were to take advantage of the Wherry housing units, and this made it necessary that they rent furniture from some source.
14. When negotiations for the acquisition of the housing units failed, a condemnation assembly, prepared by the Beal Estate Division of the San Francisco District Engineer’s office, was forwarded through the Office of the Chief of Engineers, U.S. Army, to the Attorney General, and, in turn, to the U.S. Attorney’s office in San Francisco, California.
At 8:55 a.m. on November 1, 1951, a Complaint in Condemnation (Civil Action No. 36839) was filed in the United States District Court for the Northern District of California, Southern Division. Simultaneously therewith, Declaration of Taking No. 1, directed against the Likins-Foster Monterey Corporation, and Declaration of Taking No. 2, directed against the Likins-Foster Ord Corporation, were filed in the case.
At 9:15 a.m. the Court signed an Order for Delivery of Possession, which ordered:
* * * all defendants in this action and all persons in possession or control of the property described in the Complaint in Condemnation filed herein shall surrender possession of the said property on November 1,1957 at the hour of 9:15 o’clock AMn to the extent of the estate being condemned, to plaintiff, provided that a copy of this Order shall be served upon all persons in possession or control of the said property forthwith.
This order was served upon an officer of the two Wherry corporations at approximately 4:30 p.m. on November 1, 1957, at San Jose, California. The plaintiff was not named as a party in any of the condemnation pleadings filed by the Government.
The judgment entered on June 15, 1960, in the condemnation action (Civil Action No. 36839), found that the Complaint and the two Declarations of Taking did not describe any property or property rights belonging to the plaintiff *804 (plaintiff having appeared orally, through counsel, at the condemnation trial) and that the plaintiff had no interest in the property taken under the Complaint or under the Declarations of Taking. (Judgment affirmed, Likins-Foster Monterey Corporation and Likins-Foster Ord Corporation v. United States, 308 F. 2d 595 (9th Cir. 1962).)
On October 31, 1957, the Billeting Officer at Fort Ord notified each tenant, by letter, as follows:
Department of the Army plans to complete a contract at a very early date with Likins-Foster Corporation gertaining to the Wherry Housing Units at Fort Ord, California. In order to avoid any complications, the Commanding General, Fort Ord, desires that NO REPEAT NO rent be paid by occupants of Wherry Housing for the month of November until further notice.
On November 1, 1957, the Commanding General of the Sixth Army (San Francisco) sent a telegram to the Commanding General of Fort Ord, which read:
THE OFFICE OP THE US ATTORNEY, SAN FRANCISCO, HAS EILED A COMPLAINT IN CONDEMNATION TOGETHER WITH A DECLARATION OR TAKING ROR THE ACQUISITION OR THE sponsor’s [SIC] INTERESTS IN THE WHERRY HOUSING AT RORT ORD, CALIFORNIA.
THE ORDER OR IMMEDIATE POSSESSION EEFECTIVE NOVEMBER 1, 1957, WAS ENTERED BY THE COURT.
THE COMMANDING GENERAL, RORT ORD, CALIFORNIA, WILL ASSUME RESPONSIBILITY ROR CUSTODY, OPERATION AND MAINTENANCE OR THE WHERRY HOUSING UNITS AT RORT ORD, CALIFORNIA, AS OF 0915 HOURS, 1 NOVEMBER 1957. ADDITIONAL INSTRUCTIONS WILL FOLLOW.
At approximately 4 p.m., November 1,1957, the Chief of Staff, Fort Ord, sent a letter, by messenger, to G. Lee Mackey, the project manager for the two Wherry corporations (and also resident manager of the plaintiff’s operations), advising him of the contents of the above-quoted telegram, that the Army had condemned the sponsors’ interests in the Wherry housing, and that the Commanding General, Fort Ord, was assuming responsibility for custody, operation, and maintenance. No documents or letters stating that the Government was taking or wanted to purchase any of the plaintiff’s property were served or mailed to the plaintiff, and no *805 notice was served on the tenants concerning property leased from the plaintiff. The plaintiff was not directed to stop its rental business; nor was the plaintiff told that it could continue its rental business. No notice stating that rental payments for the plaintiff’s personal property should continue was served on any tenant.
15. On November 1, 1957, L-F Ord and L-F Monterey held numerous utility easements; 1,000 housing units (apartments constructed on land owned by the United States), one unit of which was used as a “project” office by L-F Ord, L-F Monterey, and the plaintiff; a concrete warehouse (partially occupied by part of the plaintiff’s inventory); a sheetmetal warehouse; some 1,000 ranges and refrigerators; and numerous window shades, most of which items were installed in the housing units, with some stored in the concrete and sheetmetal warehouses (all of which were subject to the chattel mortgages). L-F Ord and L-F Monterey also owned 9 motor vehicles and numerous items of equipment, office furniture, and spare parts, all of which were utilized by the two Wherry corporations for the maintenance and operation of the 1,000 housing units. The two Wherry corporations employed 25 to 80 workers at Fort Ord on November 1, 1957. The two Wherry corporations were paid, in full, for all of the items above listed, following a condemnation trial in the United States District Court and after appeal to the Ninth Circuit.
Prior to November 1, 1957, the housing units were occupied by military personnel who rented the apartments from the two Wherry corporations. After the filing of the condemnation action on November 1, 1957, the 1,000 housing units were changed from “private” quarters to “public” quarters. There was no change in occupancy — the tenants remained the same — but the tenants no longer received a statutory quarters allowance and they were no longer charged rent for the apartments. On October 31 and November 1, 1957, the Army authorities at Fort Ord stationed a soldier outside the “project” office to advise the military tenants not to pay their November rent because (1) the tenants would not receive their statutory quarters allowance from the Army, and (2) if they paid their rent, they might have to wait for a *806 refund. It does not appear that information regarding payment of rent to the plaintiff for furniture and/or television antennas was either specifically included or excluded from this advice.
16. (a) The terminology used in the Complaint in Condemnation and in the two Declarations of Taking created some confusion as to what property was included within the Order of Possession. The pertinent part of Declaration of Taking No. 1 reads:
3. The estates taken are as follows:
(a) All right, title and interest of Likins-Foster Monterey Corn., arising out of lease dated June 27, 1952, bearing Contract No. DA(s) 04 — 203-eng-27l, between the Secretary of the Army, representing the United States of America, and Likins-Foster Monterey Corp., a Delaware Corporation, together with all the tenements, hereditaments, appurtenances, apparatus, fixtures and equipment located on Parcels Nos. 1, 2 and 3, and being the property of said corporation; subject to the rights of Pacific Gas and Electric Company * * *
* * * * *
The identical wording was also used to describe the interests of L-F Ord in Declaration of Taking No. 2, except for a different lease number, and the wording in both declarations essentially corresponds to the equivalent language in the Complaint in Condemnation.
The words “apparatus” and “equipment” created the confusion. From November 1,1957, the Army at Fort Ord did not know whether the Order of Possession included any personal property of the two Wherry corporations, except for the items in the chattel mortgages, described in the Complaint in Condemnation and in the Declarations of Taking. There was no dispute or confusion concerning the two Wherry sponsors’ interests in the leases as such interests were described in the Complaint in Condemnation and were included in the Order of Possession.
The confusion was compounded by the failure of the Army Command to establish a firm position of the meaning of the Order of Possession and by the Army’s need to use certain supplies for current maintenance and operation, such sup *807 plies being clearly personal property of L-F Ord and L-F Monterey.
(b) From 9:15 a.m. until approximately 4 p.m. on November 1, 1957 (Friday), there were no meetings between representatives of the Army and representatives of L-F Ord and L-F Monterey. The Wherry corporations continued to operate the Wherry projects up until 4 ¡p.m., when they were given a letter from the Chief of Staff, Fort Ord. (See finding 14.) Shortly thereafter an oral working agreement was entered into at Fort Ord between Col. William E. Holley, Fort Ord Post Engineer, and Gr. Lee Mackey, project manager for L-F Ord and L-F Monterey, for the use of L-F Ord’s and L-F Monterey’s spare parts for maintenance over the weekend. Maintenance personnel of L-F Ord and L-F Monterey were placed on the Army’s payroll as of November 2,1957, for that portion of their work which constituted maintenance. Many of these same employees remained on L-F Ord’s and L-F Monterey’s payroll for that portion of their later work which was involved in the taking of the inventories of L-F Ord’s, L-F Monterey’s, and the plaintiff’s assets at Fort Ord.
Beginning about November 4th or 5th, as each spare part belonging to L-F Ord or to L-F Monterey was taken from the warehouse, it was listed jointly by a man representing the Wherry corporations and by an Army employee. Some spare parts of the Wherry corporations had already been taken by the Army without this immediate accounting, and L-F Ord’s and L-F Monterey’s trucks had been used by the Army for maintenance activity.
(c) The plaintiff had received rental for furniture and television antennas for the month of November 1957, since rental was payable in advance, but it was voluntarily refunded to the tenants by the plaintiff.
(d) Prior to and on November 1,1957, L-F Ord and L-F Monterey maintained locks on the two warehouses (wherein some of the plaintiff’s property was stored). These keys and others were gathered by the superintendent of maintenance, at the project manager’s direction, and were left in the rental office. The only keys owned exclusively by the plaintiff were those to the master television antenna system *808 control box. The project manager mailed these keys to the Army at Fort Ord. The keys were returned by mail to the project manager, and they were again returned to the Army. Somewhere between November 1st and 2d, Army personnel placed additional padlocks on the two warehouses; L-F Ord and L-F Monterey then installed their own locks on November 5th at the direction of their president, T. Jack Foster. Thus, each warehouse then had two locks installed, the keys for one lock being held by the Army and the keys for the other lock being held by the project manager. The concrete warehouse was integrated into the Fort Ord guard (police) system.
L-F Ord’s, L-F Monterey’s, and the plaintiff’s personnel had access to these warehouses at all times, subject to finding authorized Army personnel to unlock the warehouses.
The two warehouses were condemned and were included in the Order of Possession. Inside the warehouses were stored, among other things, some ranges and refrigerators which were described by serial number in Exhibit “A” to the chattel mortgages, referred to in the Complaint in Condemnation and in the two Declarations of Taking. The advice given to Fort Ord on October 31st and November 1st was that only real property was taken, and Colonel Holley’s calls to the Sixth Army, for clarification, concerned the Wherry housing maintenance materials. Fort Ord received instructions to take only the realty and chattel mortgage personalty. Confusion arose because of the following: uncertainty about the legal limits of the condemnation action, an estimated requirement for L-F Ord’s and L-F Monterey’s spare parts for maintenance, and by Likins-Foster personnel saying that the Army instructions were wrong, and that L-F Ord and L-F Monterey (and, by implication, the plaintiff) were leaving the items of personal property which the plaintiff contended were taken in the condemnation action but which items Fort Ord had no instructions to accept.
(e) The Army authorities decided to leave all furniture and television antennas (which had previously been rented to tenants) where they were until the dispute over the extent of the condemnation order could be resolved. These items *809 continued to be used by the tenants until tbe furniture was removed by tbe Army from tbe apartment units to tbe warehouses, sometime between November 1 and December 15, 1957. No rental bad been paid for the use of any furniture or TV antennas after November 1,1957.
(f) Sometime after November 1, 1957, tbe radio sets on L-F Ord’s and L-F Monterey’s vehicles were cannibalized by tbe Army Post Signal Officer.
(g) On or about November 1,1957, Army authorities took possession of tbe “project” rental office and used it for their operation. A desk, used by T. Jack Foster, was emptied of its contents; however, L-F Ord’s, L-F Monterey’s, and tbe plaintiff’s personnel continued to use the office, at least during tbe inventory period.
17. On Monday, November 4, 1957, at 11 a.m., a conference was held in tbe Office of tbe Deputy Post Commander at Fort Ord. It was attended principally by John Goss, Ralph E. Chase, and William A. limes, officers of L-F Ord and L-F Monterey (and the plaintiff) and tbe Deputy Post Commander, James L. Hathaway, tbe Post Engineer, Col.. William C. Holley, and John F. Murdock, Chief of the Property Accounting office, from the San Francisco District Engineer’s office. At this meeting the representatives of L-F Ord and L-F Monterey stated that they interpreted the Order of Possession, entered on November 1, 1957, to include all of the Wherry housing property, and they demanded that Murdock conduct an inventory of all property owned by the Wherry corporations. Mr. Murdock had instructions from the San Francisco District Engineer’s office to inventory only the real property, described in the two Declarations of Taking, and the ranges, refrigerators, water heaters, and Venetian blinds, which were described in Exhibit “A” attached to each chattel mortgage.
An Army representative stated that there were items, belonging to L-F Ord and L-F Monterey, stored in the warehouses, which items the Army would like to have for the maintenance of the housing units, and that there were other items which the Army didn’t want.
Prior to the meeting of November 4,1957, Colonel Hathaway had inquired of Mackey the cost of making the master *810 television antenna system operative. He was furnished this information. Subsequently, Colonel Hathaway privately discussed with Murdock the retention of the system by the Army for use in an educational television program.
At the November 4, 1957, conference, Army authorities informed L-F Ord and L-F Monterey representatives that no personal property had been taken, except the items described in Exhibit “A” to the chattel mortgages; and Mr. Murdock, who was sent to Fort Ord for property matters and who had the responsibility for inventorying the property taken, refused to inventory any personal property not listed on Exhibit “A” to the chattel mortgages.
Throughout November 4th (Monday) items of spare parts, owned by the two Wherry corporations, taken from the warehouse and from a maintenance truck, were utilized by the Army to service the 1,000 housing units. No agreement regarding the personal property was reached on November 4th between the Army representatives and L-F Ord’s and L-F Monterey’s representatives (who were also representatives of the plaintiff). The plaintiff was' not mentioned in the discussion of November 4th. No property of the Biggs Rental Company was taken from the warehouse. Property already in the rental units, belonging to the plaintiff, continued to be used by the Army personnel who were tenants, however.
On November 5,1957, T. Jack Foster, president and owner of the controlling interest in L-F Ord, L-F Monterey, and the plaintiff, met at Fort Ord with Colonel Holley and Mr. Murdock. At that time, Colonel Holley informed Foster that the Army was not taking personal property. Mr. Mur-dock still refused to inventory the personal property. Mr. Foster had his employees place their own padlocks on the Wherry warehouses, which then could be opened only by the Army and Likins-Foster personnel jointly. Later that day, Colonel Hathaway and Colonel Holley reversed their policy — the Army ceased utilizing spare parts of the two Wherry corporations, and-they advised Foster that the Army would adopt a “hands off” policy concerning the maintenance items located within the warehouse. The Army retained keys to the warehouses, however (see finding 22)..
On November 5th, Foster placed a telephone call to a *811 Washington, D.C., associate and complained that the Army at Fort Ord had refused to cooperate. Col. Paul Symbol, Chief of the Family Housing Division (Pentagon), telephoned Foster at Fort Ord and talked with him, Colonel Holley, and Mr. Murdock, on extensions. Colonel Symbol’s instructions pertinent to the dispute were that the only personal property taken by the Army was that of the Wherry corporations, as described in the chattel mortgages.
Mr. Foster consistently took the position that all personal property had been taken and that he would leave it all in place.
On November 4th and 5th, telephone calls were placed by Fort Ord Army authorities and by Sixth Army Headquarters to Harlan B. Watkins, Chief of the Real Estate Division of the San Francisco District Engineer’s office, who, in turn, placed telephone calls to the Chief of Engineers, Real Estate Office, Washington, D.C. All of . these calls were of an inquiring nature, wherein advice was sought as to whether the wording in the Declarations of Taking in the condemnation action included any personal property of L-F Ord and L-F Monterey, other than that described in Exhibit “A” to the chattel mortgages. Mr. Watkins did not know of the existence of the plaintiff until November 7,1957.
The Army representatives and all Government officers mentioned varied in their opinions as to whether the automobiles and the spare parts owned by the two Wherry corporations were included within the broad language set forth in the condemnation pleadings.
,18. On November 7, 1957, Roy C. Lytle appeared in the United States District Court in San Francisco on behalf of L-F Ord and L-F Monterey, Wherry sponsors. The Government was represented by Charles R. Renda, Assistant United States Attorney.
Mr. Lytle requested on behalf of L-F Ord and L-F Monterey that he be allowed to withdraw, from deposit with the Court, $783,000 deposited with the two Declarations of Taking, and, further, he made an oral appearance on behalf of the plaintiff. This was the first time that Watkins was aware of the existence of the plaintiff or that it owned any rental personal property at Fort Ord. Mr. *812 Lytle asserted the position that the two Declarations of Taking and the Order of Possession, filed and entered on November 1, 1957, included all the property of the three corporations and that all property was to be left at Fort Ord. Mr. Benda argued for the Government that the Declarations of Taking did not include the personal property, other than that described by the chattel mortgages.
19. On November 8, 1957 (Friday), a meeting was held in the office of Mr. Benda, Assistant United States Attorney, attended by Mr. Foster and his attorney, Mr. Lytle, Mr. Benda for the Department of Justice, Mr. Watkins, Mr. Bodney H. Hamblin, and Mr. Murdock of the San Francisco Corps of Engineers, Colonel Holley of Fort Ord, Colonel Potter of the Sixth Army, and some others. Since the District Court had not ruled on whether the personal property had been condemned, this meeting was called to discuss the personal property of the two Wherry corporations and of the plaintiff. Mr. Foster and his attorney reiterated their stand that the condemnation proceedings included the personal property of all three corporations, and that they would leave it all at Fort Ord. The Government representatives reiterated their opinion that the condemnation pleadings included only the items on the chattel mortgages, but did not include any other personal property.
Mr. Foster offered to disassemble the master television antenna system but was told that it might be used by the Army for educational television.
. It was agreed at this meeting that two inventories would be prepared, one of all of the disputed maintenance personal property of L-F Ord and L-F Monterey, and the second of all of the rental personal property owned by the plaintiff. It was agreed that the values of the items would be arrived at, using standard valuation methods and accepted depreciation schedules. The purpose of the inventories was that if the parties agreed as to the number and identification of the items and their value, it would eliminate such issues from the condemnation trial. Thus, the only issue for the District Court that would be left would be the legal one, *.e., “Was the personal property taken within the condemnation pleadings ? ”
*813 20. On November 11, 1957 (Monday), Murdock of the Army Corps of Engineers proceeded to Fort Ord to take the inventories in conjunction with L-F Ord’s, L-F Mon-terey’s, and the plaintiff’s employees.
On November 21, 1957, the inventories of all of the disputed personal property of L-F Ord, L-F Monterey, and the plaintiff, were completed, pursuant to the above-described arrangements.
On that same day, Mr. Foster dictated two letters, addressed to the “District Engineer, U.S. Army Engineer District, San Francisco,” in the presence of Mr. Murdock and members of his staff and in the presence of the Likins-Foster staff. He signed these letters as president of L-F Ord, L-F Monterey, and the plaintiff. Mr. Murdock then endorsed each letter “Accepted by: John F. Murdock, Chief, Property Accounting Branch, San Francisco District.”
The first letter reads as follows:
Bepresentatives of the Army and representatives of Likins-Foster Ord Corp., Likins-Foster Monterey Corp., Biggs Bental Co., a corporation, have made a thorough inventory of the stock, supplies and equipment on hand November 1,1957, which was the date the Army took possession of the 1,000 Wherry housing units at Fort Ord, California. The quantity of the items and the price of the items, $99,947.89, has been agreed upon and a list is attached to this letter.
My attorney has advised me that the order of taking as fifed condemns all furniture, fixtures, equipment, supplies and motor vehicles. As President of these three corporations, I am leaving all furniture, fixtures, equipment, supplies and motor vehicles in the possession of the Army and will expect remuneration either from the Army or I will expect remuneration in the form of a judgment in federal court.
In May, 1953, our company contracted for a community television antenna system to serve 500 units in North Bay View Park at a cost of $48,800.00. We were going to charge the tenant $5.00 a unit for the original hookup and $8.00 a month rental. This was all done with the knowledge and consent of the Army. This system has never worked satisfactorily and we have been assured by an expert that this system could be put in working order for approximately $5,000.00. Our company has a bond for the proper completion of this sys-tern and a suit will be instigated by our company against *814 the contractor and the bonding company and it is agreed that any amount we should recover in this suit will be retained by this company for the damage we have suffered.
Possession of and title to the items on all lists were passed to the Army on the morning of November 1,1957.
Yours very truly,
LIKINS-FOSTER ORD CORP.
LIKINS-FOSTER MONTEREY CORP.
BIGGS RENTAL CO.
/s/ T. Jack Foster_
T. Jack Foster, President
ACCEPTED BY:
/d/ John F. Murdock
John F. Murdock, Chief,
Property Accounting Branch San Francisco District
TJF/mhs
Enc.
Nov. 21, 1957
BECAP OF INVENTORIES
Likins-Fostek Okd Corp. and Likins-Fostek Monterey Corp.
main warehouse_$15,713.81
Bench stock and tools
RADIO - 2,274.90
Equipment and spare parts
METAL WAREHOUSE_ 6, 759. 48
Bench stock and tools
wood shed_ 2,172. 79
Bench stock and tools
automotive equipment_ 10,290.00
OFFICE FURNITURE, EQUIPMENT AND SUPPLIES_ 9, 831. 00
STATIONERY AND SUPPLIES_ 1,463.74
TELEPHONE SYSTEM_ 705. 01
Used to activate water pump
Sub Total_ 49,210.73
Biggs Bental Co.
FURNITURE AND TV ANTENNAS_ 12, 917. 16
MASTER TV SYSTEM_ 37, 820. 00
Total- 99,947.89
note: It has been agreed that 15% handling charges should be added to specified figures of the inventory but that this has been waived.
/s/ JFM
/s/ TJF
*815 The second letter provides:
This acknowledges receipt of the ownership certificates of the motor vehicles listed below:

Make Year Engine number

Chevrolet_ 1954 0006549F55X
Chevrolet_ 1957 A570111267
Chevrolet_ 1954 1011028F54N
Chevrolet_ 1951 JBA726796
Chevrolet_ 1954 JBA494492
Chevrolet_ 1954 JCA455649
Chevrolet_ 1953 JCA1016999
Chevrolet_ 1954 JBA518161
Willys Jeep_ 1953 35122452A
This also acknowledges receipt of all the keys to all the locks and all of the keys to the rental office.
Yours very truly,
LIKINS-EOSTER ORD COUP.
LIKINS-POSTER MONTEREY CORE.
BIGGS RENTAL CO.
Jé/ T. Jack Foster
T. J ack Foster, President
ACCEPTED BY:
/s/ John F. Murdock
/s/ John F. Murdock, Chief,
Property Accounting Branch
San Francisco District
TJF/mhs
Enc.
Mr. Murdock was the only responsible representative of the Office of the District Army Engineer present at Fort Ord during all times pertinent to these findings. Mr. Mur-dock was not a contracting officer.
21. On November 22, 1957, Mr. Foster wrote a letter to Col. Paul Symbol, Family Housing Division (Pentagon), Washington, D.C., which reads, in part, as follows:
* * * As far as that is concerned they [local office of engineers] have not received instructions to this date. I have taken the position that the order of taking included all supplies, furniture, equipment, fixtures and motor vehicles.
$ Hi Hi Hi Hi
22. Upon completion of the inventories, Murdock returned to his office in San Francisco and delivered to the Chief of the Real Estate Division (Watkins) the automobile registra *816 tion. certificates (“pink slips”), which.accompanied Foster’s second letter of November 21st (see finding 20), together with copies of the two letters of November 21st, prepared by Foster and endorsed by Murdock at Fort Ord.
Mr. Murdock executed a DD Form 290 in order to transfer intra-governmental responsibility for. the inventoried items to the Army authorities at Fort Ord.
On November 27, 1957, Watkins of the Corps of Engineers consulted with Foster but he made no comment on the effect of the letters of November 21st. Also, on that same day, Murdock wrote to Foster, enclosing amended inventory pages for approval. His letter was acknowledged, and the inventory changes were approved by Likins-Foster, by letter dated December 3,1957.
On or about November 27, 1957, Mr. Watkins and his office attorney, Mr. Hamblin, consulted about the implications of Mr. Murdock’s signature appearing on the Foster letters, dated November 21st. Either Mr. Maxwell, Chief of the Acquisition Branch, under Mr. Watkins, or Mr. Hamblin, instructed Murdock to have Fort Ord personnel furnish a duplicate set of keys to Likins-Foster.
This was done by Fort Ord authorities and the keys to the warehouses and to the Wherry “project” rental office were sent, by registered mail, to Likins-Foster & Associates, and receipted for by G. Lee Mackey on December 12, 19.57.
On December 23, 1957, the U.S. Army Engineer District (San Francisco), by registered mail, returned the automobile registration certificates (“pink slips”) to Likins-Foster & Associates. The letter stated, in part, as follows:
Both letters referred to above [Foster’s letters of November 21, 1957], bear the phrase “Accepted By;” at the bottom of each letter, followed by the signature of John F. Murdock, Chief, Property Accounting Branch, San Francisco District. The Government’s position, as was stated in court, is that the Declarations of Taking No. 1 and 2, filed in court, did not include any of the personal property of Likins-Foster Ord Corp. or Likins-Foster Monterey Corp., which was not actually installed in the buildings on November 1, 1957. It is the Government’s position that nothing was taken from the Biggs Rental Company.
*817 The office has advised F.t. Ord to return duplicate keys to the warehouse and office so that you may remove your personal property at any time. It is the position of this office , that unless the Court rules otherwise, the non-installed personal property and vehicles of the two sponsor corporations and all of the Biggs Bental Company property is in possession of and is still owned by the said companies. Its presence on Government property makes the Government an involuntary custodian.
If we receive any instructions from our higher command, we will advise you.
Sincerely yours,
/s/ Harlan B. Watkins
HarlaN B. WatkiNS
Chief, Beal Estate Division
The “pink slips” referred to above were still in the possession of L-F Ord and L-F Monterey as late as June 10, 1960.
23. None of the plaintiff’s property was directly used by the Army. Furniture and television antennas at the apartment units continued to be used by the tenants until removed to the warehouses sometime between November 1 and December 15, 1957. No Government officer or representative, orally or in writing, told any of the plaintiff’s officials that the plaintiff could not continue its rental business or that it could not remove its personal property. Conversely, the plaintiff’s officials were not told that they could continue its rental business or that it could remove its property.
The Army authorities did not use the master television antenna system; it was inoperative at all times pertinent to this action. It was physically located on telephone and electric light poles.
24. The equities of the two other Likins-Foster Wherry corporations were condemned at Biggs AFB, El Paso, Texas. Mr. T. Jack Foster had various communications, both written and oral, with the Air Force officials concerned with the condemnation. A total of approximately $46,000 was paid for personal property related to this condemnation at Biggs AFB. The itemization of that personal property was described by Foster, for the Wherry corporations, as follows:
*818 Bench stock (Including 15%)-$23,660.51
Maintenance equipment- 4, 779. 00
Hand tools_ 989.75
Waeehouse office equipment- 115.00
Office equipment_ 7,031.50
Automotive equipment- 7,635.00
Other equipment_ 2,673. 00
46, 883.76
25. On January 15,1958, Mr. Foster moved from Ms residence on tlie Fort Ord reservation. Several soldiers with, inventories of the plaintiff’s furniture used in that residence were present when he moved. The plaintiff’s furniture which was in the apartment was not removed by Mr. Foster. There is no evidence that he either tried to remove it or that he was prevented from removing it.
26. All of the plaintiff’s property pertinent to this case is still in the Army’s possession at Fort Ord. . Nothing has been paid to the plaintiff for any of this property. '
27. The plaintiff has failed to establish any fair market value for the rental of any or of all of its property.
28. The United States District Court for the Northern District of California entered a written pretrial order on January 18, 1960, which discussed all property taken by the condemnation order. The Court entered judgment on that date that all of the disputed personal property of the two Wherry Corporations, L-F Ord and L-F Monterey, consisting of nine vehicles, spare parts, office furniture, inter alia, as set forth in the inventory prepared by the Government and by Likins-Foster representatives, had been taken, and the sum of $49,534.58 was awarded to the two Wherry corporations. On June 15, 1960, the United States District Court for the Northern District of California entered a judgment, after jury verdict, on the remaining issues in the condemnation action and therein found that the Complaint in Condemnation and the two Declarations of Taking did not describe any property or property rights of the plaintiff, and that the plaintiff had no interest in the property rights condemned. The plaintiff made an oral appearance at the trial through counsel, Roy C. Lytle.
*819 CONCLUSION of law
Upon the foregoing findings of fact, which, are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is dismissed.

 Under the Wherry Act (Housing Near Military Establishments), 63 Stat. 570 (1949), 12 U.S.C. §§ 1702, 1706, 1715c, 1716, 1748-1748 (g) (1964), sponsor corporations, known as “Wherry” corporations', lease property from the government on which they build housing to be rented to military personnel. The lessees receive quarters allowances from the armed services and pay rentals directly to the corporations. Rental payments for furniture and television antennas, involved here, would not be covered by quarters' allowances.
The Act, which provides certain financial and insurance benefits, requires that there be a separate corporation for each project.

 Under the Capehart Housing Act, the government owns and operates housing at or near military bases. Tenants do not pay for Capehart housing and, therefore, do not receive quarters allowances. The procedure for transforming Wherry housing into Capehart housing is provided for by 69 Stat. 635, 652 (195.5), as amended, 70 Stat. 1091, 1111 (1956), 12 U.S.C. § 1748 (1964).

 We do not use the word “abandon” In the usual technical sense, i.e., that plaintiff left the property on the premises without ever Intending to either be paid for same or to ever take steps for the return thereof.