**DAILY et al. v. UNITED STATES.**

**No. 48747.**

United States Court of Claims.

June 5, 1950.

Joseph R. Greenwood, Washington, D. C., for the plaintiffs.

Herbert Pittle, Washington, D. C., with whom was Assistant Attorney General A. Devitt Vanech, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This is an action brought by Dean C. Daily, individually and as executor of the estate of Mary Belle Hardison, Virginia M. Daily, and Elmer R. Addington, to recover just compensation for a crop of gray banana squash allegedly taken and destroyed by the United States.

Plaintiffs Dean C. Daily and Virginia M. Daily were, prior to February 5, 1943, each the owner of an undivided one-fourth interest in Lots 584, 585, 586, and 598 and the south half of Lot 599 of Tract No. 1000, as per map recorded in Book 19, pages 1 to 34, inclusive, of Maps, in the Office of the County Recorder of Los Angeles County California, all of which lots constituted one entire tract of land, known as the Los Angeles Metropolitan Airport. The remaining undivided one-half interest in said lots was, prior to February 5, 1943, owned by the estate of Mary Belle Hardison, the plaintiff Dean C. Daily being executor of the last will and testament of said Mary Belle Hardison, deceased.

Plaintiff Elmer R. Addington, was, prior to February 5, 1943, the lessee under a share crop lease of a portion of the land described, which portion comprised 91.18 acres. Under the terms of that lease, the owners agreed to furnish seed, water, fertilizer and labor and the lessee agreed to supervise and carry on the planting, cultivation, harvesting and sale of all crops. After deducting the costs, the owners of the land agreed to divide the profits equally with the lessee Addington.

Between June 15 and June 20, 1942, plaintiff Addington planted the 91.18 acres to gray banana squash. On July 20, 1942, while this crop of squash was growing, the plaintiffs, Dean C. Daily and Virginia M. Daily, with the consent of Addington, granted to the United States of America, acting through the office of the Chief of Engineers of the United States Army, a Survey and Construction Permit covering all of the land above described, including the 91.18 acres planted to squash. This permit is set out in our Finding 6.

On July 20, 1942, the Government as a permittee under the Survey and Construction Permit entered upon plaintiffs' land and began construction work on an airport. In so doing, the crop on 66.18 acres of plaintiffs' land was destroyed, and the crop on the remaining 25 acres was damaged.

Thereafter, on February 5, 1943, the United States instituted condemnation proceedings in the United States District Court for the Southern District of California to acquire the land belonging to the plaintiffs, including the 91.18 acres here in question. These proceedings resulted in a judgment to the plaintiffs of $462,500, plus interest at six percent per annum from February 5, 1943, until the principal amount was deposited in the office of the Clerk of the Court. By stipulation between the parties, it was agreed that that condemnation proceeding would not consider the damage to the plaintiffs resulting from the destruction or taking of the squash crop on July 20, 1942.

The question before us is the value of the crop of gray banana squash at the time it was partially or totally destroyed by the Government.

The Commissioner of the Court has found, and the defendant agrees, that the fair value of the crop on the entire 91.18 acres on July 20, 1942, taking into consideration the expected yield per acre, the cost of maturing the crop, the market value in November 1942 of a mature crop in the field, and the market for the crop actually produced, is $8,784.50.

Plaintiffs claim the crop had a net value of $22,958.44, to which interest should be added as a part of just compensation.

■ The most acceptable method for arriving at the value of a crop at the time of its destruction, assuming it had no market value at that time, is to first estimate the probable yield at harvest had the crop not been destroyed, then determine the market value of the crop at harvest and from that deduct the value and amount of labor and expenses which would have been necessary to continue the cultivation and marketing of the crop after its destruction, Hankin v. United States, 3 Cir., 143 F.2d 408, 410; Wolfsen v. Hathaway, 32 Cal.2d 632, 198 P.2d 1; 175 A.L.R. 162 and cases collected under section 3, section 11 and section 12 of that annotation.

Thus we consider the probable yield at harvest time had the growing crop of gray banana squash not been destroyed. According to the witnesses on the part of the plaintiffs, a yield of 12 to 14 tons per acre could reasonably have been expected, while defendant's witnesses said 6 to 8 tons. There is some testimony to the effect that a yield of 17 tons per acre might have been expected from this particular land. The record discloses that this was very good land for the growing of squash and that plaintiff Addington was generally known as one of the best squash growers in the San Fernando Valley.

The crop report of 1942 for Los Angeles County prepared by the Agricultural Commissioner of that county showed that a total of 7,760 tons of squash was produced on 1,035 acres planted to squash in 1942, an average of 7.5 tons per acre. Obviously, this figure included production from all kinds of land—good, bad and average, subject to all kinds of endeavor on the part of individual farmers.

■ We know that 210 tons of squash were actually harvested from the 25 acres of land which plaintiffs reentered and brought on to harvest. There is some evidence that most of this harvest came from 11 of the 25 acres as the other 14 had suffered so much from neglect between July 20, 1942, and the time plaintiffs reentered about one month later, that the crop could only partially be saved. If we attribute the 210 tons of production to the whole 25 acres, an average of 8.4 tons of squash per acre was actually harvested. If we should attribute the entire production to the 11 acres, it appears that almost 20 tons to the acre were produced. In view of this actual production at harvest time from a portion of the land, the character of the land, Addington's general reputation as a squash farmer, and all the evidence before us, we believe that a production of 1,002.98 tons of squash an average of 11 tons per acre, could reasonably have been harvested by plaintiffs had not the defendant taken their crop as a result of its entry upon the land on July 20, 1942.

We now consider the market value of the squash at the time it was harvested. The evidence discloses that gray banana squash and pink banana squash are harvested at approximately the same time and thus compete with one another when placed immediately upon the market which is sometime in late October or early November of each year. However, gray banana squash is a variety specially developed because of its storage qualities which permits it to be held off the market until late winter or early spring when other squash is not available. For this reason it does command a special price at harvest time.

In November of 1942 the wholesale market price for first quality banana squash in Los Angeles, the nearest market, ranged from $30 to $40 per ton and since the usual custom is for growers to sell their crop at the field, there is a spread between the wholesale market price in Los Angeles and the price paid the grower at the field of from $10 to $20 per ton.

Plaintiffs and their witnesses were of the opinion that their squash was worth from $25 to $30 per ton in the field, while others were of the opinion that it was worth $15. From the evidence we conclude that had plaintiffs been able to carry their entire crop to harvest, it would have been worth $20 per ton to them in November of 1942 in the field.

Because plaintiffs were not required to carry their crop to ultimate harvest, certain

expenses incident thereto were not incurred and hence are to be deducted from the gross amount found to be due them at harvest time. These expenses would cover the cost of fertilizing, irrigating, cultivating and harvesting the crop. Plaintiff Addington estimated that it cost $34 per acre to plant and grow a crop from the beginning. Since this crop was approximately one-fourth mature at the time of its destruction, three-fourths of the total expense ordinarily involved was not incurred by plaintiffs. Plaintiffs say the heaviest expenses are incurred at the beginning when the original plowing, planting, fertilizing and irrigating are done. However, the continued care required to bring a good crop to maturity and the harvest expenses would tend to warrant an average allocation of expenses over the entire period of time ordinarily required to produce a squash crop.

Any allocation of expenses must of necessity be only an approximation and under the circumstances here confronting us, we think it would be fair to accept an estimated cost of $34 per acre and deduct one-fourth of that amount, or $8.50, which would represent the expense borne by plaintiffs up to the time their crop was destroyed. Thus plaintiffs are to be charged with $25.50 per acre on the 66.18 acres on which the crop was totally destroyed, an amount of $1,687.59.

Plaintiffs actually harvested 210 tons worth $20 per ton at harvest time; hence, $4,200 is also to be deducted from the amount found to be due them.

Based upon these findings, our mathematical calculations are as follows: 1,002.-98 tons at $20 per ton equals $20,059.60, less deductions of $5,887.59, or $14,172.01, which is the sum found to be due plaintiffs for the taking and destruction of their crop of squash.

■■ As part of just compensation for the taking of their crop, plaintiffs are entitled to interest from July 20, 1942. The power of the Government to take under eminent domain applies to personal property as well as real property, United States v. Klamath and Moadoc Tribes, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219, and this court has frequently held that it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, which determines whether there is a "taking" within the meaning of the Fifth Amendment to the Constitution. Causby v. United States, 60 F.Supp. 751, 104 Ct.Cl. 342, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; Id., 75 F. Supp. 262, 109 Ct.Cl. 768; Camp Far West Irrigation District v. United States, 68 F. Supp. 908, 107 Ct.Cl. 263.

Defendant entered upon plaintiffs' land under a Survey and Construction Permit which contained, among others, this paragraph: "7. It is anticipated that construction work will be programmed so as to permit the harvesting of existing crops, however, in the event that it should become necessary for the Government to enter upon the area occupied by growing crops, the owner waives no right whatsoever to claim and receive full compensation for the value of any crops destroyed or damaged."

Shortly after entry, defendant did destroy plaintiffs' crop and almost immediately began condemnation proceedings through which it took title to plaintiffs' land.

■ The defendant says that since it entered lawfully under the construction permit, it occupied the land in the nature of a lessee who had covenanted not to commit "waste" upon the land. However, the record discloses that the original entry was made with the expressed intention that the Government would eventually take plaintiffs' property. Paragraph 5 of the construction permit provided: "5. It is understood by Owner that the acquisition of said premises by Government has been or is about to be authorized * * *." The authorization here mentioned appeared to refer to a court order which would follow condemnation proceedings instituted in the exercise of the Government's power of eminent domain.

The defendant was at all times in a position to "take" the property, both real and personal, whether by one fell swoop or by degrees and it is apparent that defendant

did "take" the whole property at the time of its entry, and later temporarily turned back 25 acres of the whole tract for the sole purpose of salvaging as much of the personalty—the squash crop—as possible.

In our opinion, the "taking" of the growing crop was as complete as the taking of plaintiffs' land for which they were later paid with interest as part of just compensation.

We therefore conclude that plaintiffs are entitled to judgment in the amount of $14,172.01 for the taking of their squash crop plus an additional amount as part of just compensation measured by interest at the rate of 4 percent per annum from July 20, 1942, until paid.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.