Duane BARNES et al.

v.

The UNITED STATES.

Leonard NIELSEN

v.

The UNITED STATES.

Louis J. SVOBODA and Jacqueline G. Svoboda

v.

The UNITED STATES.

Alvin S. HANZLIK et al.

v.

The UNITED STATES.

Nos. 878–71, 90–73, 237–73 and 340–73.

United States Court of Claims.

July 9, 1976.

Richard A. Spellman, Omaha, Neb., for plaintiffs and attorney of record for plaintiffs in No. 340–73.

William G. Campbell, Omaha, Neb., attorney of record for plaintiffs in Nos. 878–71, 90–73, and 237–73; Kutak Rock Cohen Campbell Garfinkle & Woodward, Omaha, Neb., of counsel.

John E. Lindskold, Washington, D. C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D. C., for defendant.

Before NICHOLS, KUNZIG and BENNETT, Judges.

## OPINION

BENNETT, Judge:

The parties in these four consolidated inverse condemnation actions, claiming almost $2 million, plus interest, attorney fees, and costs, have submitted the cases to us for decision under Rule 134(b), upon a stipulation of facts filed May 14, 1975, and a supplementary stipulation filed October 3, 1975. The court accepts these stipulations and adopts them as its findings of fact.[1] On the basis of the facts so found and the law, and for the reasons hereinafter set forth, we conclude that the plaintiffs are entitled to recover in amounts to be deter-

---

1. Only those facts deemed material to the decision are set forth in this opinion.

mined in further proceedings under Rule 131(c).[2]

At all relevant times plaintiffs were landowners of, or owners of crops on, riparian and nonriparian fast lands situated adjacent to the confluence of the Missouri and Niobrara Rivers, near the town of Niobrara, Knox County, Nebraska. At this point, the Missouri, a navigable river, flows in a generally southeasterly direction, some 36 miles downstream from the Fort Randall Dam. Thirty-three miles further downstream one encounters the Gavins Point Dam, which since it began impounding water in Lewis and Clark Lake in 1955 has backed the reservoir all the way upstream to a point approximately 3 miles below the intersection of the two rivers. The Niobrara River empties into the Missouri in this vicinity with some considerable velocity, having followed a steeper course in its generally northerly flow.

For hundreds of years the swift currents of the Niobrara have deposited sediment near its mouth, and beyond—into the slower moving and relatively flat Missouri. These sediments from time to time have formed deltas of varying magnitude and duration in the Missouri River channel, either at or immediately downstream from the junction of the Missouri and the Niobrara. Prior to the construction and closing of the Fort Randall Dam in 1952, seasonal high flows of the Missouri River resulting from melting snow and rainfall would scour out and flush away, either partially or entirely, the sediment accumulations deposited by the Niobrara in the Missouri. Since that time, however, these seasonal high flows have been eliminated, and so too the periodic, natural removal of excess sedimentation.

The Government's engineering studies conducted in planning the Fort Randall and Gavins Point Dams indicated that the Niobrara's sediment load would continue to be deposited in the Missouri, but officials concluded that the rapid degradation of the Missouri River bed below the Fort Randall Dam would prevent undue accumulation, delta growth reaching equilibrium after 7 to 12 years. Likewise, the studies recognized that a principal effect of aggradation would be to raise the surface and groundwater elevations in the area of the town of Niobrara.

Due to the continuing deposition of sediment in the Missouri after the closing of the Fort Randall and Gavins Point Dams, by 1964 a delta of unprecedented magnitude became established in the Missouri River channel at the mouth of the Niobrara River. Its size remained stable between 1965 and 1969, vegetation becoming established in places and rendering that part of the delta more permanent than portions not affected by vegetation. Thus, the channel carrying capacity of the Missouri has become increasingly restricted over the years. By 1967 the Niobrara delta had so restricted the channel of the Missouri as to reduce its carrying capacity to about 48,000 to 60,000 cubic feet per second (c. f. s.), or roughly 50 percent below its pre-1952 capacity.

Since 1969 releases have been made from the Fort Randall Dam to evacuate the excess water accumulation caused by rains and melting snows. Some of plaintiffs' lands experience marginal flooding damage, owing to backwater effect, when discharges are maintained at 30,000 c. f. s. Such damages occur on lower areas of the Swanson property (case Nos. 878–71 and 340–73) at discharges of 15,000–20,000 c. f. s. Sustaining damages occur on some of plaintiffs' lands at times when discharges are maintained above 40,000 c. f. s., as a result of water backing up old chutes or drainage ditches, seepage under land, and submergence of low, gently sloping channel banks. Such sustaining damage also results from restriction of surface and subsurface drainage. When Fort Randall Dam discharges are maintained at about 48,000 c. f. s., com-

2. Case No. 878–71 is for taking of and damage to crops only. Case No. 90–73 claims a taking of and damage to crops, plus a taking of a flowage easement. Case No. 273–73 claims a total taking of land. Case No. 340–73 claims a taking of and damage to crops, plus a taking of a flowage easement.

plete flooding appears on some of plaintiffs' lands.

The stipulation recites that prior to 1952, occasional flooding would result from the Missouri's seasonal high flows. However, the then adequate channel carrying capacity could accommodate the additional volume in a relatively short period of time, and crops could be planted and harvested the same year without substantial difficulty. For example, in 1952 when the "flood of record" occurred, the waters had receded sufficiently by April, and the rise in June and July did not exceed 66,500 c. f. s. A successful crop was planted and harvested the same year. Prior to 1952, plaintiffs' lands were never subjected to sustained high flows during mid-August, September, October, or November. Prior to that time plaintiffs never experienced high-water tables or surface or subsurface drainage problems. Plaintiffs' lands were then among the most productive agricultural lands in Knox County, Nebraska, being useful for grazing, and the growing of corn, alfalfa, winter wheat, sorghum, and milo. Additionally, some of the riparian lands had recreational value. The lands involved in these cases consist of approximately 2,775 acres of river bottomlands along the Missouri River and 48 acres along the Niobrara River.

Flooding problems of a more lasting character began for these plaintiffs in August and September, 1969, when releases from Fort Randall Dam exceeded 50,000 c. f. s. on a sustained basis. Some 1,740 acres of bottomlands, more or less, were influenced by high waters, two-thirds of which were inundated by surface flooding. The remainder of the affected property was isolated or waterlogged by seepage, or subjected to impaired surface and subsurface drainage as well as raised groundwater table elevations. During the period between August and November of 1970, effects were experienced when releases from the Fort Randall Dam regularly surpassed 40,000 c. f. s. Surface and subsurface drainage was impeded. Plaintiffs' crop yields were reduced due to the fact that some of the acreage inundated in 1969 had not drained properly and remained waterlogged. Wetness rendered pasturelands largely useless.

While there was no bank overtopping in 1971, during the months of August through September of that year plaintiffs' lands were inundated by subsurface seepage, impaired drainage, and waters backing up into plaintiffs' creeks, chutes and drainage ditches. Gently sloping channel banks and other areas immediately adjacent to the Missouri banks were submerged. Releases during this period commonly were 47,000 c. f. s. Pasturelands were unusable; crop yields were reduced and some standing crops had to be destroyed. Flooding in August through November of 1972 approximated that of the same months in 1971. During the comparable period in 1973, releases from the Fort Randall Dam and the flow of the Missouri by plaintiffs' lands did not exceed 36,300 c. f. s. except for short periods. However, it is undisputed that as a result of the sustained high releases from Fort Randall Dam in 1969 through 1973, the elevation of the groundwater table beneath plaintiffs' lands has been raised to within 0 to 3 feet beneath the surface. The supplementary stipulation reveals that sustained releases from the Fort Randall Dam from late July through October 1975 reached 60,000 c. f. s., increasing the adverse effects previously described. Further, the presence of higher groundwater manifests itself through destruction of the land for pasture purposes, extensive cattail growth, killing of trees, rotting of crops, failure of seeds to germinate, and inability to use farm machinery on the land. It is not open to doubt upon this record that the underlying cause of the flooding problems experienced by plaintiffs is the control, storage and regulation of the flow of the Missouri River by the construction and operation of the main stem reservoir system of the Missouri River, of which the Fort Randall Dam is a part. Additionally, we are satisfied that the damaged land and crops were situated above the pre-1969 established ordinary high-water marks of the Missouri and Niobrara Rivers.

Finally, the parties have stipulated that, in the future, sustained releases from the Fort Randall Dam during the period August–November of each year may be estimated to exceed 50,000 c. f. s. in one year out of five. Releases on a sustained basis of 47,000 c. f. s. can be expected one year out of four, and continuing releases of 40,000 c. f. s. probably will occur one year out of three. Thus, the facts warrant the finding that the flooding which typified the period from 1969 to 1973 will continue indefinitely.

The parties have placed before us three separate questions. First, we must decide whether plaintiffs' lands and/or crops, or any interest therein, were taken for public use within the meaning of the fifth amendment to the Constitution. If some interest was taken, we then must inquire as to the appropriate date of taking for purposes of figuring just compensation. Finally, if we decide that the relevant date is in 1973, as contended by plaintiffs, and not 1969 as defendant would have it, we must resolve the problem of whether the fifth amendment authorizes an award for loss of crops in years prior to the date of taking selected.

I

 The fifth amendment to the Constitution of the United States provides, in part: " * * * nor shall private property be taken for public use, without just compensation." Over the years the decisions have developed the law of eminent domain as applied to instances of flooding. Generally speaking, property may be taken by the invasion of water where subjected to intermittent, but inevitably recurring, inundation due to authorized Government action. *United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917). We have so held in numerous cases, *e. g., Hartwig v. United States,* 485 F.2d 615, 619–20, 202 Ct.Cl. 801, 809 (1973); *King v. United States,* 427 F.2d 767, 769, 192 Ct.Cl. 548, 551–52 (1970); *Fromme v. United States,* 412 F.2d 1192, 1196, 188 Ct.Cl. 1112, 1118 (1969); *National By-Products, Inc. v. United States,* 405 F.2d 1256, 1273, 186 Ct.Cl.

546, 576 (1969); *B Amusement Co. v. United States,* 180 F.Supp. 386, 389, 148 Ct.Cl. 337, 341–42 (1960); *North Counties Hydro-Elec. Co. v. United States,* 151 F.Supp. 322, 323, 138 Ct.Cl. 380, 383, *cert. denied,* 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957). A constitutional taking resulting from such flooding is not limited to instances of obvious overflowing of a river's banks. The just compensation clause of the fifth amendment has been found likewise applicable in cases of percolation or rising ground water. *United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950). A taking may result where Government-induced deposition of sediment in a riverbed causes the river to overflow its banks. *Cotton Land Co. v. United States,* 75 F.Supp. 232, 109 Ct.Cl. 816 (1948). The cases disclose the rule that the permanent, intermittent flooding which amounts to a taking must be frequent, *Fromme v. United States, supra,* 412 F.2d at 1196–97, 188 Ct.Cl. at 1118–19, and productive of substantial damage, *United States v. Cress, supra* at 328. Government-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort. In such cases recovery is not authorized in this court. 28 U.S.C. § 1491 (1970); *Sanguinetti v. United States,* 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608 (1924); *Bedford v. United States,* 192 U.S. 217, 225, 24 S.Ct. 238, 48 L.Ed. 414 (1904); *Hartwig v. United States, supra; National By-Products, Inc. v. United States, supra; Columbia Basin Orchard v. United States,* 132 F.Supp. 707, 710–11, 132 Ct.Cl. 445, 452 (1955).

 Additionally, the waters which effect the taking must rise above the ordinary high-water mark of the navigable river involved, for the action of water within the limits of the riverbed may be altered by the Government without liability in the exercise of what has come to be known as a "dominant servitude." *United States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956); *United States v. Willow River Power Co.,* 324 U.S. 499, 509, 65 S.Ct. 761, 89 L.Ed. 1101 (1945).

Finally, in cases such as these, plaintiffs need not allege or prove that defendant specifically intended to take property. There need be only a governmental act, the natural and probable consequences of which effect such an enduring invasion of plaintiffs' property as to satisfy all other elements of a compensable taking. *Richard v. United States,* 282 F.2d 901, 904, 152 Ct.Cl. 225, 230 (1960), *modified on other grounds,* 285 F.2d 129, 152 Ct.Cl. 266 (1961); *B Amusement Co. v. United States, supra; Biggs Rental Co. v. United States,* 353 F.2d 1013, 173 Ct.Cl. 789 (1965); *Cotton Land Co. v. United States, supra,* 75 F.Supp. at 235, 109 Ct.Cl. at 831–32. It has often been held that the Government may take less than the entire fee interest in real property. As the Supreme Court put it in *Cress, supra:*

> * * * where * * * it appears that less than the whole has been taken and is to be paid for, such a right or interest will be deemed to pass as is necessary fairly to effectuate the purpose of the taking; and where * * * land is not constantly but only at intervals overflowed, the fee may be permitted to remain in the owner, subject to an easement in the United States to overflow it with water as often as necessarily may result from the operation of the * * * [Government activity]. [243 U.S. at 329, 37 S.Ct. at 385.]

*Accord, King v. United States,* 504 F.2d 1138, 205 Ct.Cl. 512 (1974) (flowage easement); *Richard v. United States, supra* (seepage easement).

Defendant resists plaintiffs' claims principally by referring us to this court's decision in *Pitman v. United States,* 457 F.2d 975, 198 Ct.Cl. 82 (1972). There the plaintiff owned oceanfront property in Florida. The force of the Atlantic Ocean over the years had not eroded his beach because of the prevailing southern littoral drift in the area, which would regularly replenish what sand was swept away by the currents. In the course of opening a harbor entrance to the north of plaintiff's property, the Corps of Engineers constructed two jetties at the entrance channel. These structures deprived plaintiff's property of the replenishment of sand provided by the southern littoral drift, and thereby caused the beach to be eroded. After the ocean had claimed some 4 acres of his land plaintiff constructed a seawall and groin, and brought suit here for just compensation. Chief Judge Cowen, speaking for the full court, held that the petition should be dismissed since none of plaintiff's property was taken in the constitutional sense. The plaintiff had no property right in the uninterrupted and natural flow of the Atlantic Ocean, 457 F.2d at 976, 198 Ct.Cl. at 85, and neither alleged nor proved that defendant raised the level of the Atlantic Ocean above the high-water mark thereby permanently inundating his land. 345 F.2d at 977, 198 Ct.Cl. at 87. The court took care to distinguish *Cress, supra,* and cases in that line. For that reason the *Pitman* case provides no obstacle whatever to plaintiffs' recovery in the instant cases. *Pitman* was an erosion case; not a flooding case. The damage to plaintiff's property there was occasioned strictly as a consequence of the Government's exercise of the dominant servitude— "the paramount power of the United States to improve navigation." 457 F.2d at 977, 198 Ct.Cl. at 86.

We think *Cotton Land Co. v. United States, supra,* provides an apt precedent for plaintiffs' recovery. The plaintiff corporation's riparian land was situated along a 16-mile stretch beginning 86 miles downstream from the Hoover Dam on the Colorado River, and ending just over 53 miles upstream from the Parker Dam. Parker Dam began impounding water in 1938, and within several years had backed water up in a lake stretching all the way to a point within 4 or 5 miles to the south of plaintiff's property. The backwater effect of the Parker Dam caused the Colorado River to lose its velocity and, accordingly, to deposit sediment in its bed in close proximity to the plaintiff's property. As a natural consequence of this sedimentation, the riverbed and level of water were raised, causing significant flooding and damage for which plaintiff sought just compensation. We held for the plaintiff because, owing to authorized Government action,

* * * a succession of events was initiated which, when the events had all occurred in their natural order, deprived the company of the beneficial use of its land. * * *. [75 F.Supp. at 233, 109 Ct.Cl. at 828.]

It was observed that where the damage is the natural consequence of governmental action, such damages are not "too remote," or consequential. 75 F.Supp. at 233, 109 Ct.Cl. at 829. All other elements of a compensable taking appeared as well.

■ Defendant attempted to distinguish *Cotton Land Co.* when pressed at the argument[3] by observing that in the cases now before the court, the backwater effect and flooding were immediately caused by the *delta,* and not as in *Cotton Land* by a downstream dam. If ever there was a distinction without a difference, this seems to be it. Moreover, the *Cotton Land* court stated that the sand deposits resulting from backwater effect "had the characteristics of a typical delta." 75 F.Supp. at 233, 109 Ct.Cl. at 827. The stipulation in these cases tells us that Government officials actually foresaw that delta growth would be a factor to consider in evaluating the impact of the Fort Randall and Gavins Point Dams. We are quite satisfied that the delta's unprecedented size and tenacity were natural consequences of the closing of the dams in the area, and that the flooding disclosed upon this record was a natural consequence of delta growth. As held in *Fromme v. United States, supra,* 412 F.2d at 1196, 188 Ct.Cl. at 1118, it is immaterial whether the flooding caused by the Government is from a backwater effect or by the prevention of proper drainage. The result is the same if the effect is inevitably recurring.

■ Plaintiffs have fulfilled the remaining elements of legally sufficient inverse condemnation claims. While the flooding is intermittent, the experience of 1969 through 1973, and 1975,[4] together with future projections, show that the flooding is of a type which will be inevitably recurring. The flooding has been occasioned by authorized Government action for public use—construction and operation of the Fort Randall and Gavins Point Dams. The flooding has certainly been frequent enough and will continue to be sufficiently frequent to constitute a taking. Numerous photographs jointly placed in the record by the parties for our assistance bear graphic witness to the fact that the flooding has been productive of substantial, sustained damage to land and crops. The flooding and attendant damage occurred above the ordinary high-water marks of the Missouri and Niobrara Rivers. The damage being the natural consequence of authorized Government action, the taking package is complete. We conclude, therefore, that defendant took a flowage easement appurtenant to the lands of the plaintiff landowners, but that it did not take the fee to any land. Likewise, we think defendant took property from those plaintiffs who are owners of crops alone, measured by the amount by which the value of their respective interests were diminished as of the date of taking.

■ Defendant has misconstrued plaintiffs' claims as being based upon an alleged and nonexisting property right against the United States in the unaltered flow of the Missouri River. On the contrary, plaintiffs base their case squarely on the fifth amendment and have alleged a taking of crops, land and a flowage easement because of the waters of the Missouri which flooded and invaded plaintiffs' lands "as a result of the construction and operation of the Missouri River dams." Plaintiffs have claimed and shown to the satisfaction of the court that operation of the dams has placed waters on and under their lands above and beyond the ordinary high-water mark of the Missouri River so as to decrease or destroy their value for agricultural purposes. Plaintiffs

---

**3.** Plaintiffs devoted a significant portion of their main brief to a discussion of *Cotton Land Co.,* and to us it is evident that this case was plaintiffs' principal authority. Defendant failed altogether to discuss *Cotton Land* in the briefs.

**4.** The stipulations before us do not contain any facts relating to the flooding in 1974.

have acknowledged the dominant servitude of the Government in navigable waters, such as the Missouri River, but only as to property that is below and not beyond the ordinary high-water mark, as is their property in these cases. Their damage is thus not consequential but compensable for a taking. As above stated, the flooding damages suffered by the plaintiffs are the natural consequences of acts of the defendant, and the damages are permanent in character. The stipulation shows that defendant anticipated the creation of a delta and a rise in the groundwater elevations in the area.

## II

It next becomes necessary to determine the appropriate date of taking, for purposes of fixing just compensation. Defendant proposes 1969, the first year of sustained flooding. Plaintiffs contend for 1973, taking the position that only then could it be said with relative certainty that the flooding would be permanent.

In *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), the Court faced this sort of question in deciding whether an inverse condemnation suit was barred by the statute of limitations. It was said:

> Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time. * * * The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. * * *.
>
> * * * [W]hen the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just com-

pensation for what is really "taken." * * *. [331 U.S. at 748–49, 67 S.Ct. at 1385.]

We have heretofore said that the date of taking is the date the Government enters into possession of the interest seized. *King v. United States, supra*, 504 F.2d at 1142, 205 Ct.Cl. at 518. These principles are not inconsistent—the date of taking here is not in our view the date of the first flood in 1969, but rather in 1973 after it first became clearly apparent by the passage of time that the intermittent flooding was of a permanent nature. Adopting a date of taking must often be done in a somewhat imprecise manner, this aspect of the cases being in the nature of a jury verdict. *Drakes Bay Land Co. v. United States*, 424 F.2d 574, 587–88, 191 Ct.Cl. 389, 414 (1970). The date selected obviously depends on the facts of each case, but the facts here lead us to the firm conclusion that the date the Government completed taking its flowage easement cannot be prior to when, through passage of time, the permanent character of intermittent flooding could fairly be perceived. We think that the best date that might be suggested within these limits is November 30, 1973, this being the final day of the August–November flooding which had occurred in 1973, and in each of the previous years stretching back to 1969.

## III

Having established November 30, 1973, as the date of taking, we are confronted with the question of whether on remand to the Trial Division the trial judge will be authorized to recommend any award for crop damage sustained by the plaintiffs during the period from 1969 through 1973. Plaintiffs earnestly contend that such an award would be correct, while defendant dismisses the argument as one which sounds strictly in tort.

While we conclude that a flowage easement was taken on November 30, 1973, we do not think that any award for crop damage sustained prior to that time may be permitted. The two principal cases cited by plaintiffs on this point may readily be dis-

tinguished. In *R. J. Widen Co. v. United States,* 357 F.2d 988, 174 Ct.Cl. 1020 (1966), pursuant to an agreement with the United States, the Commonwealth of Massachusetts condemned the fee interest in plaintiff's land on July 2, 1957. A state court verdict led to judgment for just compensation for the fee so taken. Subsequently, the plaintiff brought suit here seeking additional compensation for what it termed a "temporary taking" by the United States between March 1957 and the formal date of taking by the Commonwealth of Massachusetts some 3 months later. In March of that year the contractor engaged by the Corps of Engineers had entered upon plaintiff's land and commenced work on a flood control project. The court held, in part, that plaintiff was entitled to additional just compensation measured by the fair rental value of the land between the relevant dates. 357 F.2d at 996, 174 Ct.Cl. at 1032–33. The present cases are different in that they involve a single, nondivisible taking of an easement by only one sovereign—not two as in *Widen.* At most, the court said in *Widen* that the Federal Government took a separate and distinct term of 3 months, without regard to later condemnation of the fee by the State of Massachusetts. That case provides no authority for the position that separate crop damages may be awarded where one sovereign by continuously inflicting such damage ultimately acquires a flowage easement through passage of time.

Likewise not in point is *Daily v. United States,* 90 F.Supp. 699, 116 Ct.Cl. 723 (1950). There, prior to formal condemnation proceedings in the district court, the Government entered upon land with the permission of the owner and the share crop tenant in possession, and commenced building an airport. A growing crop of gray banana squash was largely destroyed, for which damage plaintiffs sought and recovered just compensation. Our reading of the *Daily* opinion indicates that the court thought the whole property, real and personal, to have been taken all at once when the Government first placed itself in possession of the land. 90 F.Supp. at 702–03, 116 Ct.Cl. at

733–34. The court held only that the plaintiffs should be justly compensated for the taking of their crop growing on the land at the date of a de facto taking, July 20, 1942, this being the date the Government entered the land. *Daily* does not authorize us to conclude that where a taking occurs on a given date, trespass damages sustained at the hands of the Government before the taking may be bootstrapped onto the award of just compensation for the fee or other interest ultimately taken.

▮▮▮▮▮ At argument, the Government conceded only that the value of the crop growing on the date of taking, if any, could be taken into account in further proceedings in determining the value to be assigned to the flowage easement. In our estimation, a growing but immature crop cannot properly be valued separately from the value of the realty itself, for as we previously have recognized, unsevered crops not ready for harvest as a general rule constitute a part of the realty. *Cf. King v. United States, supra,* 504 F.2d at 1142, 205 Ct.Cl. at 519. The realty must be valued as a whole, including any increment in value attributable to the immature crops. In accord with our prior decisions, however, these plaintiffs, as their interests appear, may recover as a separate element of damages the value of mature crops, if any, ready for harvest at the date of taking. *Cf. id.* All of this will figure in the determination of the easement's value on remand. At best, crop damages sustained prior to the date of taking mentioned above are the product of tortious invasions—mere trespasses. Such damages are not recoverable in this court in any event. 28 U.S.C. § 1491 (1970). Not until the date of taking did these several tortious invasions ripen to the extent necessary to confer on the defendant a flowage easement. For damages sustained prior to that moment, we have no statutory jurisdiction.

Judgment is hereby entered for plaintiffs on liability, it being held that on November 30, 1973, defendant took a flowage easement appertaining to the fee lands and crop interests of these plaintiffs. An award of

damages is contingent upon plaintiffs' executing and delivering to the defendant deeds conveying a perpetual easement to flood their lands in issue, if defendant so desires it. The cases are remanded to the Trial Division for further proceedings on the question of damages, in conformity with the foregoing opinion. As a part thereof the trial judge is directed also to consider whether, and if so to what extent, these plaintiffs are entitled to recover their litigation expenses incurred pursuant to 42 U.S.C. § 4654 (1970).