Elmer A. JONES, et al.

v.

The UNITED STATES.

No. 306–79L.

United States Claims Court.

Jan. 10, 1983.

Richard A. Spellman, Omaha, Neb., for plaintiffs. Kutak, Rock & Huie, Omaha, Neb., of counsel.

John E. Lindskold, Denver, Colo., with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

HARKINS, Judge.

The petition in this case was filed on July 17, 1979, in the United States Court of Claims by six plaintiffs to obtain compensation for the taking of flowage easements over farmlands along the South Dakota bank of the Missouri River, upstream from its confluence with the Niobrara River. The flowage easement was the result of flooding and altered drainage flows caused by the Government's construction and operation of dams in the Missouri River Basin Water Control Projects, including the Fort Randall Dam upstream from plaintiffs' lands and the Gavin's Point Dam downstream from plaintiffs' lands. On July 30, 1980, the parties filed a stipulation on liability, in which the United States admitted that it had taken a flowage easement over portions of each of the plaintiffs' properties, and the parties agreed that November 30, 1973, was the date of taking of the flowage easement. The stipulation recited that the exact geographical limits and extent of the flowage easement on each property had not been determined and that such issues of fact remained to be resolved in further proceedings or settlement negotiations on the issue of damages.

Plaintiffs' petition in this case followed and was based upon the findings of fact and decision on July 9, 1976, of the United

States Court of Claims in *Barnes*,[1] a case brought by owners of farmlands on the Nebraska bank of the Missouri, directly opposite plaintiffs' properties. The *Barnes* claims, filed in 1971 and 1973, were decided on the basis of stipulations filed on May 14, and October 3, 1975, and adopted as the court's findings of fact. In *Barnes,* the court found that the flowage easement had been taken on November 30, 1973.

After prolonged negotiations, on May 28, 1982, five of the six plaintiffs in this case filed a stipulation for entry of judgment for damages for the taking of a flowage easement and for attorneys fees. As part of the settlement, the five plaintiffs delivered grants of flowage easements that provided for an average monthly discharge not exceeding 80,000 c.f.s. from the Fort Randall Dam. With respect to the claims of plaintiff No. 3, paragraph 6(7) of the May 28, 1982, stipulation for entry of judgment provided:

> (7) The plaintiffs Harold E. Preszler and Eunice Preszler (3) are unable to enter into this stipulation for the reason that they claim that the United States must relocate an irrigation system which is located on their property either as a part of their just compensation in the above entitled action or under Public Law 91–646. An administrative appeal has been taken with respect to the denial of their application for relocation benefits under Public Law 91–646, and the parties are unable to, at this time, resolve this problem. Consequently, the parties stipulate that the cause of action involving Harold E. Preszler and Eunice Preszler (3) remain separately docketed pending final resolution, and that 13.65% of the plaintiffs' attorneys fees and expenses set forth in paragraph 6 above ($9,112.83) shall be attributed to the efforts on behalf of Harold E. Preszler and Eunice Preszler (3) as of the date hereof.

On June 18, 1982, judgment was entered for the five plaintiffs in the amounts set forth in the stipulation, without prejudice to the claims of Harold E. and Eunice Preszler, plaintiffs No. 3.

On July 29, 1982, plaintiffs Harold E. and Eunice Preszler by motion requested an order that the taking of the flowage easement over their farmlands includes a taking of an irrigation system consisting of mechanical and electrical equipment, structures, pipes, and other materials, located on and beneath their real estate. The motion was supported by an affidavit of Harold E. Preszler and counsel's brief. Although the precise boundaries of defendant's flowage easement over the Preszler properties have not been determined, the facts essential for a decision on this motion have been either determined or stipulated and are not in dispute. The motion is treated as a motion for partial summary judgment.[2]

The issue presented by plaintiff's motion is whether a land owner, in an inverse condemnation case, is entitled to compensation for permanent improvements made on the property in good faith within the area of a flowage easement before the date of taking is known but after the easement has been taken.

The irrigation system for which the Preszlers' claim compensation as part of the taking of the flowage easement was installed after the taking date, but before the July 9, 1976, decision in *Barnes.* On January 28, 1976, after discussion of various alternative designs with representatives of the Army Corps of Engineers, the Preszlers obtained a permit to withdraw water from the Missouri River. During these discussions, Harold E. Preszler received the impression that the Corps of Engineers' representatives had rejected one design because of wildlife considerations, and had given assurances that the high waters previously experienced would not recur or affect the

---

1. *Barnes v. United States,* 210 Ct.Cl. 467, 538 F.2d 865 (1976).

2. Pursuant to an Oct. 14, 1982, order, under RUSCC 77.1, defendant filed a response on

operation of the system as finally installed.[3] Construction and installation of the irrigation system was completed in June 1976.

When the permit was obtained and the irrigation system was constructed, plaintiffs did not know the legal significance of the high waters which had inundated the property, and were unaware that a lawsuit had been filed by owners of property across the Missouri River claiming that a flowage easement had been taken. Howard E. Preszler asserts that the first time he was advised of the possible liability of the United States for taking a flowage easement on the property was in the summer of 1979, several months before his claim was filed.

The irrigation system was constructed for a total cost of $140,000. Plaintiffs' estimates, obtained in 1981, show that it would cost approximately $80,000 to relocate the portions of the system that are located within defendant's flowage easement area.

The intake structure and pumping station of the irrigation system are located between elevation levels 1208 feet, m.s.l., and 1226.5 feet, m.s.l. Defendant seeks formal conveyance of an easement to elevation 1235 feet, m.s.l. Defendant, in its response to plaintiffs' motion presented estimates by the Corps of Engineers that projected water surface elevations of from 1221 feet, m.s.l. to 1223.7 feet, m.s.l. for flows from 50,000 c.f.s. to 80,000 c.f.s.[4] These calculations do not accord with the facts as stipulated, or as found by the court, in *Barnes*. For purposes of this motion, plaintiffs' contention that the flowage easement that has been taken includes the area where the intake structure and pumping station of the irrigation system are located is accepted.

Plaintiffs' theory is: because they did not know the legal significance of the flowage easement that had been taken when the irrigation system was constructed, because, at that time, the official posture of defendant was that an easement had not been taken, because they acted in good faith to construct an irrigation system to enhance the value and productivity of a legitimate farming operation, and because the nature of an inverse condemnation case suit requires the date of taking to be determined long after the actual taking is occurred, they are entitled to compensation for the diminished value of the irrigation system and appropriate severance damages. Plaintiffs assert that, under the facts of this case, defendant since it could have refused to grant the permit until pending issues were resolved was in a far superior position to prevent plaintiffs' damage. Denial of compensation, plaintiffs claim, would place all risk of loss on innocent and uninformed citizens.

Counsel cite no direct precedent, and none has been found, on either side of the proposition that an owner acting in good faith is entitled to just compensation in an inverse condemnation case for permanent improvements made on property after the taking date.[5] Plaintiffs point to authority

---

Nov. 12, 1982, and plaintiffs filed a reply on Dec. 14, 1982.

3. Defendant has found no record in the files of the Corps of Engineers, Permits Evaluation and Formulation Section, Regulatory Functions Branch, Operations Division, Omaha District that supports or refutes plaintiffs' contentions. For purposes of this motion, plaintiffs' assertions about the discussions with representatives of the Corps of Engineers concerning the permit are accepted.

4. Water surface elevations at the Preszler pump site under 1975 conditions in the Corps of Engineers estimates were:

| | |
|---|---|
| 50,000 c.f.s. | 1221 feet m.s.l. |
| 60,000 c.f.s. | 1222 feet m.s.l. |
| 80,000 c.f.s. | 1223.7 feet m.s.l. |

The expected event frequency of such discharges were estimated:

| Releases | Events Interval |
|---|---|
| 80,000 c.f.s. | 200 years |
| 60,000 c.f.s. | 18 years |
| 50,000 c.f.s. | 6 years |

5. In two cases, *Mock v. United States,* 164 Ct.Cl. 473 (1964); and *Davis v. United States,* 164 Ct.Cl. 612 (1964), the United States Court of Claims considered improvements made after the date of taking. Both cases involved avigation easements, and included as a collateral issue the question of whether improvements built after the taking date was proof that the value of the land had not been diminished. The court concluded that such facts were neutral on the issue of valuation.

that would allow a land owner to be compensated for the full value of uncompleted improvements that had been started on land where a public improvement had been proposed but condemnation proceedings had not been initiated. Public improvements are often proposed without actually being consummated, and, in such circumstances, the authorities hold it would be unjust to deprive the owner of legitimate use of his land.[6] Circumstances in such cases, however, are not the same as a Government seizure in a taking case. Establishment of the date of taking in an inverse condemnation requires a factual demonstration entirely different from the situation where an owner starts construction although he is aware that a public improvement has been proposed but not approved. The date of taking in a flooding case is determined only after the proofs demonstrate that the Government has entered into possession of the interest seized, and its permanent character fairly is perceived.

The date of taking in an inverse condemnation has a different factual predicate, and serves a different function than passage of title. In a taking case, title to the property passes to the Government only when the owner receives compensation. Transfer of title, however, does not determine when the Government's obligation accrued or when the owner's property was seized without a court order. When the Government has entered into possession of property prior to the acquisition of title, it is the former event which constitutes the act of taking. Seizure, measured by the taking date, (1) gives rise to the claim for compensation; (2) fixes the date as of which the land is to be valued; and (3) establishes the time the Government's obligation to pay interest accrues.[7] The value to be ascertained does not include, and the owner is not entitled to, compensation for elements resulting subsequent to or because of the taking.[8]

In *Barnes,* the court reviewed the history of flooding at the Niobrara junction with the Missouri that followed construction of the Fort Randall Dam. The court concluded that these facts, and the estimates stipulated as to future releases, indicated the flooding would continue indefinitely. The court observed:

Finally, the parties have stipulated that, in the future, sustained releases from the Fort Randall Dam during the period August-November of each year may be estimated to exceed 50,000 c.f.s. in one year out of five. Releases on a sustained basis of 47,000 c.f.s. can be expected one year out of four, and continuing releases of 40,000 c.f.s. probably will occur one year out of three. Thus, the facts warrant the finding that the flooding which typified the period from 1969 to 1973 will continue indefinitely.[9]

This finding of fact was followed by an in depth examination of judicial precedent that developed the law of eminent domain as applied to intermittent but inevitably recurring flooding due to authorized Government action. Decisions applicable to fixing the date on which the Government has seized possession of flooded properties disclosed the principle that the taking date was the date when it became clearly apparent on the facts that the intermittent flooding was of a permanent nature. This date, in *Barnes,* was November 30, 1973. On that date, "the facts here lead us to the firm conclusion that the date the Government completed taking its flowage easement cannot be prior to when, through passage of time, the permanent character of intermittent flooding could fairly be perceived." [10]

---

6. *Citing* 4 Nichols' *The Law of Eminent Domain,* § 13.14, (3rd Ed.1981).

7. *United States v. Dow,* 357 U.S. 17, 22, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958) and cases there cited.

8. *Olson v. United States,* 292 U.S. 246, 256, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934).

9. *Barnes v. United States, supra* note 1, 210 Ct.Cl. at 473, 538 F.2d at 870.

10. *Barnes v. United States, supra* note 1, 210 Ct.Cl. at 480, 538 F.2d at 873.

As the court found in *Barnes,* and as the Preszlers have stipulated, by November 30, 1973, permanent flooding conditions were obvious. In 1975, the year preceding construction of plaintiffs' irrigation system, releases from the Fort Randall Dam from late July through October reached 60,000 c.f.s., with resultant increase in the flooding conditions already apparent.

Plaintiffs concede there is no question that their farmlands had been affected by high waters prior to construction of the irrigation system in 1976 and that this issue was determined in *Barnes.* On such facts, there is little significance to the circumstance that *Barnes* was decided after plaintiffs had constructed the irrigation system. Plaintiffs' land was taken in 1973 and no new taking since 1976 has been shown. In 1976, flooding conditions made it obvious that the Government's operation of the Missouri River Main Stem System had permanently interfered with plaintiffs' use of that part of their farmlands affected by the altered flow. Plaintiffs cannot be permitted to ignore such physical conditions and avoid responsibility for knowledge that the Government had taken part of their land when they chose to go forward in 1976 with their irrigation system.

Preszlers' land must be valued as of November 30, 1973, and improvements placed upon the property within the flowage easement after that date, including the irrigation system, are not eligible for inclusion in compensation for the taking. This situation is analogous to crop damage experienced after the Government has acquired a flowage easement. Recovery for crop damages subsequent to the acquisition of a flowage easement routinely is denied.[11]

The motion for partial summary judgment of plaintiffs Preszler is denied.

11. *King v. United States,* 205 Ct.Cl. 512, 518, 504 F.2d 1138, 1142 (1974).