DYK, Circuit Judge,
with whom GAJARSA and LINN, Circuit Judges, join, concurring in the denial of the petition for rehearing en banc.
Contrary to the dissents’ characterization, the approach here was compelled by existing law established by settled Supreme Court and circuit precedent.
The Supreme Court has long required that we “distinguish[ ] between torts and takings.” See Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355 (Fed.Cir.2003) (citing Barnes v. United States, 538 F.2d 865, 870 (Ct.Cl.1976)). A taking, involving a “permanent condition of continual overflow” or a “permanent liability to intermittent but inevitably recurring overflows,” United States v. Cress, 243 U.S. 316, 328, 37 S.Ct. 380, 61 L.Ed. 746 (1917), is distinct from a tort — an “injury [that] was in its nature indirect and consequential,” Sanguinetti v. United States, 264 U.S. 146, 150, 44 S.Ct. 264, 68 L.Ed. 608 (1924).
In drawing this line, the “[Supreme] Court has consistently distinguished between flooding cases involving a permanent physical occupation ... and cases involving a more temporary invasion.” Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 428, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). “A taking has always been found only in the former situation.” Id. Indeed, flooding only amounts to a taking when it “constitute[s] an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property.” Sanguinetti, 264 U.S. at 149, 44 S.Ct. 264.
*1379 Flooding constitutes this type of permanent invasion when there is a “permanent condition of continual overflow” or “a permanent liability to intermittent but inevitably recurring overflows.” Cress, 243 U.S. at 328, 37 S.Ct. 380; see also United States v. Kansas City Life Ins. Co., 339 U.S. 799, 809 n. 8, 70 S.Ct. 885, 94 L.Ed. 1277 (1950) (same). The Court in Cress expressly distinguished the “inevitably recurring” flooding in that case, which was caused by the erection of a lock and dam, from “a case of temporary flooding or consequential injury.” 243 U.S. at 327, 37 S.Ct. 380. Moreover, our predecessor court consistently recognized that flooding must be inevitably recurring to constitute a taking. The Court of Claims has held that “[t] he plaintiff must establish that flooding will ‘inevitably recur,’ in the phrasing of the Cress case.” Nat’l By-Prods., Inc. v. United States, 405 F.2d 1256, 1273, 1274 (Ct.Cl.1969) (finding that plaintiff did not prove a taking because it “failed to establish that the floodings ... will inevitably recur”). Therefore, the Court of Claims has rejected takings claims when flooding was caused by a “temporary situation” which would not lead to the “inevitably recurring floodings which the Supreme Court stressed ... in the Cress case.” Fromme v. United States, 412 F.2d 1192, 1196-97 (Ct.Cl.1969). “Government-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort.” Ridge Line, 346 F.3d at 1355 (quoting Barnes, 538 F.2d at 870).
The Court of Claims’ decision in Barnes clearly illustrates this long-governing rule. In Barnes, the government released water from a dam starting in 1969, which caused flooding on plaintiffs’ properties from 1969-1973 and again in 1975. 538 F.2d at 868-69. The government stipulated that the releases which caused the flooding would continue. Id. at 870. Based on the premise that the intermittent flooding would “continue indefinitely,” the court found that the flooding was a taking because it “will be inevitably recurring.” Id. at 870, 872. However, it held that the flooding could not constitute a taking until “the permanent character of [the] intermittent flooding could fairly be perceived,” and it therefore denied recovery for crop damage sustained before 1973, which was when it could “be said with relative certainty that the flooding would be permanent.” Id. at 873.
Here it was anything but “inevitable” that the government would continue the temporary policies that caused the flooding. The United States Army Corps of Engineers (“Corps”) made a series of ad hoc and independent decisions to deviate from the normal release rates at a dam in Missouri, which sometimes caused intermittent flooding on the plaintiffs property. The Corps’ decisions about whether or not to deviate were made on a yearly basis. The Corps attempted to bring interested parties together to formulate a new release plan for the dam; however, the groups responsible were unable to agree on a long-term solution. Ark. Game & Fish Comm’n v. United States, 637 F.3d 1366, 1369-70 (Fed.Cir.2011). As a result, multiple interim plans were adopted. Id. These multiple interim deviation plans were viewed by everyone involved, including the plaintiff, as “interim operating plan[s].” Id. at 1369-70, 1377-78.
Each interim plan differed from the next, as the Corps and interested parties tried different ideas and attempted to come to an agreement. See id. at 1369-71. Once the interested parties proposed a final plan, the Corps abandoned the concept of adopting a permanent deviation *1380 plan, returned to normal regulation, and never adopted a permanent change to the normal release rates. Id. at 1371. Under these circumstances, it could never “be said with relative certainty,” Barnes, 538 F.2d at 873, that the deviations (and hence the flooding) would even occur the following year. It certainly could not be said that the flooding would inevitably recur.
Contrary to the dissents, the panel majority did not create a blanket rule under which any flood-causing policy that is labeled temporary by the government will allow the United States to avoid takings liability. A policy that in its inception is designed to be permanent but which is later terminated could lead to liability, just as liability could exist if a permanent condition were created and the land were later reclaimed. See United States v. Dickinson, 331 U.S. 745, 746-47, 751, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). The panel majority specifically held that “in other contexts the distinction between a temporary and permanent release plan may be difficult to define,” and “[t]he government cannot ... avoid takings liability by characterizing inevitably recurring events as merely a series of temporary decisions.” Ark. Game & Fish Comm’n, 637 F.3d at 1379. If the government, with the objective of creating a permanent or recurring condition had pursued that goal by adopting fifty consecutive and identical one year deviations (Judge Moore’s hypothetical), such action might properly be viewed as permanent or “inevitably recurring.” Here, we have no such scenario. The temporary nature of the policies is more than simply a label placed on the policies by the government. Rather, it is clear that this was a situation in which there was genuine uncertainty about the nature of the policies from year to year as the Corps responded to individualized concerns and individualized circumstances over (in the aggregate) a short period of time. The government’s actions and the surrounding context demonstrate that the policies were temporary and not inevitably recurring.
Therefore, given that settled Supreme Court and circuit precedent dictated the result, I concur in the court’s refusal to rehear this case en banc.